**EXHIBIT B**

Case 3:02-cv-01138-AWT     Document 155     Filed 03/01/2006     Page 1 of 11

Slip Copy, 2005 WL 3288469 (N.D.Cal.), 36 Employee Benefits Cas. 1871

United States District Court,
N.D. California.
In re: CALPINE CORPORATION ERISA LITIGATION
No. C 03-1685 SBA.
Dec. 5, 2005.

Edward W. Ciolko, F. Andre Delfi, Joseph H. Meltzer, Edward Chang, Gerald D. Wells, III, Richard S. Schiffrin, Schiffrin & Barroway, LLP, Radnor, PA, Robert S. Green, Robert A. Jigarjian, Green Welling LLP, San Francisco, CA, for Plaintiffs.
Robert L. McKague, Morrison & Foerster LLP, Palo Alto, CA, for Defendants.

ORDER

ARMSTRONG, J.

[Docket Nos. 106, 110]

***1** THIS DOCUMENT APPLIES TO ALL ACTIONS.
This matter comes before the Court on Calpine's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [Docket No. 106] and the Committee Defendants' Motion to Dismiss the Amended Consolidated Complaint [Docket No. 110]. Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. The Court hereby GRANTS both Calpine's Motion to Dismiss Plaintiff's Amended Consolidated Complaint and the Committee Defendants' Motion to Dismiss the Amended Consolidated Complaint WITHOUT LEAVE TO AMEND.

BACKGROUND

A. Factual Background

1. Parties

Defendant Calpine Corporation ("Calpine" or the "Company"), a Delaware corporation, is a leading independent power company engaged in the development, acquisition, ownership, and operation of power generation facilities and the sale of electricity predominantly in the United States, but also in Canada and the United Kingdom. Corrected Amended Consolidated Compl. ("ACC") at ¶ 8. Calpine is also the world's largest producer of renewable geothermal energy. *Id.* Calpine is the designated Plan Administrator and a named fiduciary of the Calpine Corporation Retirement Savings Plan (the "Plan"), a 401(k) plan established and sponsored by Calpine. *Id.* at ¶¶ 1, 3, 9-10.
Defendant Investment Advisory Committee ("Advisory Committee") is a fiduciary delegate of Calpine with the duty and responsibility to directly monitor the Plan. *Id.* at ¶ 12. Through its individual members, the Advisory Committee exercised discretionary authority with respect to the management, administration, and oversight of the Plan and the management and disposition of the Plan's assets. *Id.* Defendants Kati Miller ("Miller"), Lisa Bodensteiner ("Bodensteiner"), Rick Barraza ("Barraza"), Tom Glymph ("Glymph"), Trevor Thor ("Thor"), Bob McCaffrey ("McCaffrey"), and Bryan Bertacchi ("Bertacchi") were members of the Advisory Committee during the relevant period. *Id.* at ¶¶ 13-16, 18-20. Defendant Patrick Price ("Price") was Calpine's Director of Compensation Benefits and Corporate Employment and also a member of the Advisory Committee during the relevant period. *Id.* at ¶ 17.

Plaintiff James Phelps ("Plaintiff") was an employee of Calpine and a participant in the Plan during the relevant period. *Id.* at ¶¶ 1, 3.

2. Allegations

At the end of calendar year 2000, Calpine's portfolio included forty-four power plants, with an aggregate capacity of 4,273 megawatts. ACC at ¶ 53. Twenty five of those power plants were gas-fired cogeneration plants with a total capacity of 3,385 megawatts and nineteen geothermal power generation facilities with a total capacity of 888 megawatts. *Id.* In 2000, Calpine raised approximately $8.1 billion through equity and bond offerings and renewal lease financing. *Id.* at ¶ 55. Due to "skyrocketing" energy prices, the Company also enjoyed record earnings. *Id.* at ¶ 56.
*2 In the Company's 2000 Annual Report, the Company stated:
In the past year, a series of factors have reduced the supply of power to California, which has resulted in wholesale power prices that have been significantly higher than historical levels. Several factors contributed to this increase. These included:
- significantly increased volatility in prices and supplies of natural gas;
- an unusually dry fall and winter in the Pacific Northwest, whichreduced the amount of available hydroelectric power from that region (typically, California imports a portion of its power from this source);
- the large number of power generating facilities in California nearing the end of their useful lives, resulting in increased downtime (either for repairs or because they have exhausted their air pollution credits and replacement credits have become too costly to acquire on the secondary market); and
- continued obstacles to new power plant construction in California, which deprived the market of new power sources that could have, in part, ameliorated the adverse effects of the foregoing factors.
*Id.* at ¶ 67.
On January 5, 2001, Calpine announced that it was increasing its earnings expectations for 2000 and 2001 to approximately $1.05 per share for fiscal year end 2000 ("FY00") and to $1.25 per share for fiscal year end 2001 ("FY01"). *Id.* at ¶ 63. This earnings announcement exceeded analyst expectations of $0.96 per share for FY00 and $1.20 per share for FY01. *Id.* Calpine's stock climbed to $35.06. *Id.* at ¶ 54.
On or about February 2, 2001, the Company announced in a press release that by 2005, it planned to be at 70,000 megawatts of electric generating capacity. *Id.* at ¶¶ 58, 64. On February 6, 2001, the Company announced that, before the taking of an extraordinary charge, net income for FY00 was $324.7 million. *Id.* at ¶ 64. This represented a 238% increase over the Company's 1999 net income. *Id.*
On February 28, 2001, the Company announced that it had signed two long-term power sales contracts with the California Department of Water Resources ("CDWR"), providing up to $8.3 billion in potential revenues. *Id.* at ¶ 65. On or about March 15, 2001, the Company filed its FY00 Form 10-K with the Securities Exchange Commission ("SEC").
On December 9, 2001, an article was published in the *New York Times* regarding Calpine's relationship with Enron. *Id.* at ¶¶ 59, 93. The article noted in part:
Gains from trading energy commodities and energy derivatives made up the difference. For the first nine months of 2001, 10 percent of Calpine's $1.1 billion in gross profit came from derivatives trading activity, which because of the way the company accounts for the transaction flows directly into the income statement. Another 18 percent came from trading energy itself.
...
Enron was the biggest player in that field, and the resemblance is not coincidental. Mr. Posoli, who created Calpine's trading arm, came to the company from Enron. He spent most of his four years at Enron in the group that traded energy derivatives before joining Calpine in 1999.
*3 ...
In the third quarter of 2001, $768 million, or 26 percent, of Calpine's revenue came from Enron. Also in the quarter, Enron bought 6.5 million megawatt hours of electricity from Calpine. Dividing revenue generated by Enron by the megawatt hours it bought from Calpine produces an average cost per megawatt hour of $119.13 to Enron.
This Cost is significantly higher than what other Calpine customers paid in the same period. Calpine's revenue for all megawatt hours sold during the third quarter averaged just over $84. Sales to non-Enron customers averaged a rate of $75.48 per megawatt hour.
...

But a search through energy commission's filings back to February 2000 shows only one other power sale agreement that Calpine struck with Enron-and that was one covering Jan. 13 and 14, 2001. This transaction could not account for the third-quarter business.
*Id.* at ¶ 93.[FN1]

> FN1. The Amended Complaint does not set forth the content of the entire article and the article is not attached to the Amended Complaint.

By December 14, 2001, Moody's Investors Service announced that it would cut the credit rating on Calpine's $11.6 billion of debt to "junk." *Id.* at ¶ 59. Subsequently, Calpine's shares plummeted from a starting price of $21.37 at the opening of trading on December 10, 2001 to a closing price of $13.20 on December 14, 2001. *Id.* at ¶ 60.

On April 22, 2002, Calpine settled with the Attorney General of California, thereby ending the State's investigation into allegedly illegal electricity pricing practices in California. *Id.* at ¶ 84. Calpine paid $6 million in fines. *Id.*

On January 28, 2004, Calpine settled with the Commodity Futures Trading Commission ("CFTC"), thereby ending the CFTC's investigation regarding allegedly improper energy trade reporting. *Id.* at ¶ 96. Calpine paid $1.5 million in fines. *Id.*

In May 23, 2004, Peter Cartwright, the Company's founder, Chairman of the Board, and Chief Executive Officer, publicly stated that Calpine's relationship with Enron was minimal and that other market and regulatory factors were responsible for the California market crises. *Id.* at ¶ 97, n. 7.

### B. Procedural Background

On April 17, 2003, Plaintiff filed a class action complaint pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, on behalf of the Plan and its participants and beneficiaries, and against Calpine, the Advisory Committee, Peter Cartwright, Ann B. Curtis, Jeffrey Garten, Susan Schwab, George Stathakis, John O. Wilson, and V. Orville Wright. On August 20, 2003, the Court issued an order consolidating several related cases.

On January 20, 2004, Plaintiff filed a Consolidated Complaint alleging generally that Calpine, certain members of its Board of Directors, and members of the Plan Advisory Committee and other fiduciary delegates violated their duties of prudence, care, loyalty, and Plan faithfulness under Section 404(a) of ERISA through the management and administration of the Plan's imprudent investment in Calpine stock during the Class Period. The action was brought pursuant to ERISA §§ 409, 502(a), 29 U.S.C. §§ 1109, 1132(a).

*4 On or about August 13, 2004, Calpine and the individual defendants filed separate, but related, motions to dismiss. A hearing was held on the motions to dismiss on February 11, 2005.

On March 31, 2005, the Court issued an Order dismissing with prejudice all of the claims in Plaintiff's Consolidated Complaint, with the exception of Count Three, Plaintiff's misrepresentation claim. Plaintiff was granted leave to amend Count Three if he could allege, in good faith, that defendants, acting in a fiduciary capacity, made material misrepresentations to the Plan participants. The Court instructed Plaintiff that, to support his misrepresentation claim, he could not merely rely on vague references to Calpine's public filings.

On May 9, 2005, Plaintiff filed an Amended Consolidated Complaint. Then, on May 27, 2005, after protracted discourse with counsel for defendants regarding the Court's March 31, 2005 Order, Plaintiff filed a revised Amended Consolidated Complaint. *See* Opp. to Com. Def's Mot. at 3:21-26.

On June 3, 2005, Plaintiff filed a Motion for Leave to File a Motion for Reconsideration of the Court's Order Granting Defendants' Motions to Dismiss ("Motion for Reconsideration").

On June 15, 2005, Plaintiff filed the instant Corrected Amended Consolidated Complaint (referred to herein as the "Amended Complaint"). The Amended Complaint is brought by Plaintiff, on behalf of the participants in and beneficiaries of the Plan, and against Calpine, the Investment Advisory Committee ("the Committee"), and the following individual Committee members: Miller, Bodensteiner, Barraza, Glymph, Thor, McCaffrey, Bertacchi, and Price (the Investment Advisory Committee and the individual Committee members are collectively referred to herein as the "Committee Defendants" and both Calpine and the Committee Defendants are occasionally referred to herein simply as "Defendants"). The Amended Complaint alleges that Calpine and the Committee Defendants disseminated inaccurate and misleading material information to Plan participants and withheld material information vital to

making Plan investment decisions. Plaintiff also alleges that, at numerous points throughout the Class Period,[FN2] the Company knew, or should have known, that the true underlying impetus of Calpine's continued expansion was based on (1) an increase in wholesale energy prices in the state of California stemming from allegedly unlawful and unsustainable market manipulation, and (2) the Company's allegedly unlawful "round-trip" energy trading practices. The sole cause of action alleged in the Amended Complaint is "Breach of Fiduciary Duty" and is premised on the alleged dissemination of "Misleading, Incomplete, and Inaccurate Information to the Plan and Plan Participants and Beneficiaries."

> FN2. The Class Period alleged in the Amended Complaint is January 5, 2001 through the present.

On June 17, 2005, the Court denied Plaintiff's Motion for Reconsideration.
On June 28, 2005, Calpine and the Committee Defendants filed the instant Motions to Dismiss.

## LEGAL STANDARD

### A. Motion to Dismiss

*5 Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Everest and Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. Jacobson v. Hughes Aircraft, 105 F.3d 1288, 1296 (9th Cir.1997).

The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981); see Miranda v. Clark County, Nev., 279 F.3d 1102, 1106 (9th Cir.2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); Sprewell v. Golden State Warriors, 266 F.3d 979, 987 ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), as amended by, 275 F.3d 1187 (9th Cir.2001); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir.1988) ("[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").

When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986). The court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." Moore v. Kayport Package Express, 885 F.2d 531, 538 (9th Cir.1989). Of these factors, prejudice to the opposing party is the most important. See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir.1990) (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Leave to amend is properly denied "where the amendment would be futile." DeSoto v. Yellow Freight Sys., 957 F.2d 655, 658 (9th Cir.1992).

### B. ERISA

ERISA § 404(a)(1)(A) and (B) sets forth a fiduciary's duties under ERISA. It provides, in relevant part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of [ ] providing benefits to participants and their beneficiaries [ ] and [ ] defraying reasonable expenses of administering the plan; [and] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims[.]"29 U.S.C. § 1104(a)(1)(A) and (B).
*6 Further, ERISA § 405(a) provides that:
In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.
29 U.S.C. § 1105(a).

ANALYSIS

A. Sufficiency of the Claims Under Rule 9(b)

As a preliminary matter, both Calpine and the Committee Defendants contend that, since the sole cause of action in Plaintiff's Amended Complaint is premised on fraud, the Amended Complaint must be reviewed under the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b). In response, Plaintiff argues that Rule 9(b) is inapplicable to an ERISA complaint alleging breach of fiduciary duty.FN3

> FN3. Plaintiff also argues that Calpine and the Committee Defendants "conceded" in their previous motions to dismiss that the Rule 8(a) pleading standard applies to Plaintiff's claims. This argument is misplaced. In his initial Consolidated Complaint, Plaintiff divided his ERISA claims into four separate counts, each of which alleged a separate theory of liability. Most of the breaches of fiduciary duty alleged by Plaintiff in the Consolidated Complaint were not based on averments of fraud, including claims that defendants improperly permitted a significant percentage of the Plan's assets to be invested in the Calpine stock fund, failed to monitor the Plan's Advisory Committee, and suffered from conflicts of interest caused by certain defendants' stock sales. In contrast, the Amended Complaint now contains only one cause of action concerning Calpine and the Committee Defendants' alleged material misstatements. As such, arguments that were directed at the Consolidated Complaint, which is no longer the operative complaint, are irrelevant.

Rule 9(b) provides as follows:
In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
Fed.R.Civ.P. 9(b). "[The Ninth Circuit] has interpreted Rule 9(b) to require that 'allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir.1993) (quoting Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985))."The pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Schreiber Distributing Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986) (citing Semegen, 780 F.2d at 731).
As Calpine and the Committee Defendants point out, Ninth Circuit precedent requires district courts to apply the heightened pleading requirements of Rule 9(b) to all averments of fraud regardless of whether fraud is an essential element of the underlying cause of action. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-1105, 1108 (9th Cir.2003) ("Where, as here, the averments in the complaint necessarily describe fraudulent conduct, Rule 9(b) applies to those averments"). In fact, as stated in Vess, since "[f]raud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, … [they] are therefore properly subject to Rule 9(b) in every

case." *Id.* at 1104 (emphasis added). When fraud is not an essential element of a claim, and the claim includes non-fraud allegations, only the non-fraud allegations are exempt from the pleading requirements of Rule 9(b). *Id.* When particular averments of fraud are insufficiently pled under Rule 9(b), a district court must strip those averments from the claim and examine the remaining allegations to determine whether they state a claim. *Id.* at 1105.

*7 Here, while Plaintiff is correct that the sole cause of action alleged in the Amended Complaint is "breach of fiduciary duty," it is equally true that the Amended Complaint is specifically premised on averments of fraud. In fact, the gravamen of Plaintiff's Amended Complaint is that Calpine and the Committee Defendants "breached [their] fiduciary duties to the Plan by disseminating misleading and incomplete information to Plan participants, and failing to inform participants ··· of material information regarding participants' investments in Company stock." ACC at ¶ 51. As such, under *Vess,* this Court must review Plaintiff's Amended Complaint under the Rule 9(b) pleading standard.[FN4]

> FN4. Significantly, the primary authority upon which Plaintiff relies to establish that the Rule 8(a) pleading standard applies, *In re JDS Uniphase Corp. ERISA Litig.,* No C 03-4743, 2005 WL 1662131, at *1 (N.D.Cal. July 14, 2005), contains no relevant discussion of *Vess* or Rule 9(b). As such, the Court finds that the *In re JDS* opinion is neither controlling nor persuasive.

Applying the Rule 9(b) pleading standard, it is quite apparent that the Amended Complaint falls considerably short of its requirements. It is a well-settled principle that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess,* 317 F.3d at 1106 (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997)). Further, the plaintiff "must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Id.* (quoting *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1548 (9th Cir.1994)).

All of Plaintiff's allegations regarding the dissemination of misleading and incomplete information, the purported "ill-conceive drive to leverage [Calpine's] stock," and Calpine's allegedly illegal or improper "'wash' energy trades" are entirely too vague to meet the particularity requirements of Rule 9(b). For example, although Plaintiff's claim is based in part on misleading information contained in certain Calpine press releases, the Amended Complaint fails to identify the statements in the press releases being challenged or why they were false when made. *See* ACC at ¶¶ 58, 63-65, 98. In fact, the only press release statements identified in the Amended Complaint are that:

- On February 2, 2001, the Company announced a "2005 operating goal of 70,000 megawatts of electric generating capacity";
- On February 6, 2001, the Company announced that net income "for the year ended December 31, 200 was $324.7 million, representing a 238% increase over its 1999 net income of $96.2 million"; and
- On February 28, 2001, the Company announced that it had signed "two long-term power sales contracts with the California Department of Water Resources ("CDWR"), totaling up to *$8.3 billion* in potential revenues."

*See* ACC at ¶¶ 64-65 (emphasis in original). With respect to these press release statements, the Amended Complaint is devoid of any facts showing that these statements are false or misleading. Moreover, by utterly failing to address the press release statements in his Opposition briefs, Plaintiff tacitly concedes that he *cannot* show that these particular statements are false or misleading.

*8 Similarly, with respect to the purportedly false statements contained in Calpine's 2000 Annual Report and FY00 Form 10-K,[FN5] there are no facts pled in the Amended Complaint that demonstrate that the statements were false or misleading when made. Instead, Plaintiff relies on the theory that the statements are misleading because they do not clearly state that Calpine was aware of the fact that other power generators had engaged in "market manipulation." *See* ACC at ¶¶ 80, 82-83. Plaintiff's allegations regarding the alleged market manipulation, and Calpine's alleged knowledge of it, however, are wholly conclusory. Significantly, Plaintiff never identifies who was engaged in the market manipulation, what type of manipulation was allegedly occurring, or when it occurred. Instead, Plaintiff relies on numerous non-party sources, published several years *after* Calpine's purportedly false 2000 Annual Report and FY00 Form 10-K were issued, that generally discuss certain economic studies and theories regarding the energy market. *See id.* at ¶¶ 69-78. None of the sources specifically addresses Calpine. *Id.*

> FN5. According to Plaintiff, the 2000 Annual Report and the FY00 Form 10-K are misleading because Calpine stated that:
>
> In the past year, a series of factors have reduced the supply of power to California, which has resulted in wholesale power prices that have been significantly higher than historical levels. Several factors contributed to this increase. These included:
>
> - significantly increased volatility in prices and supplies of natural gas;
>
> - an unusually dry fall and winter in the Pacific Northwest, which reduced the amount of available hydroelectric power from that region (typically, California imports a portion of its power from this source);
>
> - the large number of power generating facilities in California nearing the end of their useful lives, resulting in increased downtime (either for repairs or because they have exhausted their air pollution credits and replacement credits have become too costly to acquire on the secondary market); and
>
> - continued obstacles to new power plant construction in California, which deprived the market of new power sources that could have, in part, ameliorated the adverse effects of the foregoing factors.
>
> *Id.* at ¶ 67.

Plaintiff's allegations concerning Calpine's allegedly improper "round-trip" transactions with Enron suffer from similar defects. Although the Amended Complaint explicitly states that "Calpine ... improperly reported certain energy trading transactions, which had the net effect of further artificially boosting Calpine's apparent revenues during the Class Period," see ACC at ¶ 89, Plaintiff does not identify any facts in support of this allegation or any specific financial statements that are being challenged. Further, Plaintiff does not identify any sections of GAAP that were purportedly violated, why Calpine's accounting was improper, or how much revenue is at issue. Instead, Plaintiff relies on certain general statements made in a December 9, 2001 *New York Times* article. Since the *New York Times* article does not actually definitely state that Calpine's accounting was false, however, even construing the Amended Complaint in the light most favorable to Plaintiff, it is entirely unclear how the allegations in the *New York Times* article show that Calpine made any false or misleading statements.[FN6]

> FN6. Plaintiff also appears to rely on the fact that Calpine settled with the State of California in 2002 and the CFTC in 2004 to "prove" that Calpine engaged in false accounting practices. However, the fact that a party has settled a dispute cannot be used to prove liability. *See, e.g.*, Fed.R.Evid. 408. Therefore, these "facts" do not support Plaintiff's claim and must be disregarded.

Finally, while it is true that Rule 9(b) may be "relaxed" in some circumstances where the "evidence of fraud is within the defendant's exclusive possession," see *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1430 (9th Cir.1987), Plaintiff has not demonstrated that he is entitled to this exception. Indeed, since Plaintiff has alleged that, as a plan participant, he was the *recipient* of the allegedly misleading statements, then Plaintiff should, at the very least, be able to identify with specificity: (1) the particular statements that Calpine and the Committee Defendants made that were misleading; (2) the medium used to communicate the statements; (3) when the statements were made and by whom; and (4) how they were misleading. Indeed, this action has been pending for nearly three years and, during that time, Plaintiff has had access to a wide variety of publicly available information, including Calpine's financial statements, SEC filings, and press releases. Yet, despite the fact that Plaintiff was specifically granted leave to amend his complaint in order to state this claim, Plaintiff's Amended Complaint is totally deficient. Because Plaintiff's entire action is premised on these insufficient allegations, the Court finds that dismissal of the Amended Complaint in its entirety is warranted.

### B. Sufficiency of the Claims under Rule 8(a) and Rule 12(b)(6)

**\*9** Further, as Calpine and the Committee Defendants also assert in their Motions to Dismiss, even if the Court were to review the Amended Complaint under the more lenient Rule 8(a) pleading standard, the Amended Complaint still fails to state a claim.

Upon dismissal of the misrepresentation claim alleged in the initial Consolidated Complaint, Plaintiff was granted leave to amend only if he could allege, in good faith, that Defendants actually made material misrepresentations about the Calpine stock fund in their communications with the Plan participants while acting as Plan fiduciaries. In their Motions to Dismiss, Calpine and the Committee Defendants correctly argue that Plaintiff has not identified a single such communication made by either Calpine or the Committee Defendants.

First, with respect to the press releases identified in the Amended Complaint, Calpine and the Committee Defendants argue that the Amended Complaint does not set forth any facts sufficient to show that the press releases were distributed to the Plan participants by any of the Plan fiduciaries while acting in their fiduciary capacity. Indeed, with respect to the Committee Defendants, there is absolutely nothing alleged in the Amended Complaint that would indicate, in any way, that the Committee Defendants had anything to do with the issuance of Company press releases. Further, as the district court stated in *Stein v. Smith*, 270 F.Supp.2d 157, 173 (D.Mass.2003), general statements made in press releases are not acts of "plan administration." *Stein*, 270 F.Supp. at 173 (citing *Varity v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). Indeed, in *Varity*, the United Supreme Court found that ERISA liability was implicated only after finding that the defendant had "*intentionally* connected its statements about [the company's] financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." *Varity*, 516 U.S. at 505 ("We do not hold ⋯ that Varity acted as a fiduciary simply because it made statements about its expected financial condition or because 'an ordinary business decision turn[ed] out to have an adverse impact on the plan.' ").

Plaintiff has also failed to show that the allegedly misleading SEC filings were communicated to the Plan participants by Calpine or the Committee Defendants while acting as Plan fiduciaries. Moreover, although Plaintiff states in his Oppositions that the Form 10-K-which is the only document alleged to contain the purportedly misleading statements-was *directly* provided to the Plan participants, this fact is not actually alleged in the Amended Complaint. In fact, the Amended Complaint only states that the document was "directly *or indirectly*" disseminated to all Calpine employees. ACC at ¶ 67 (emphasis added). This is insufficient to state a claim under *Varity*. Compare with *Varity*, 516 U.S. at 493 (misleading statements about company's viability directly communicated to plan participants at special meeting called by plan fiduciaries to persuade plan participants to make certain changes to their employer and benefit plan).

**\*10** Further, contrary to Plaintiff's current mistaken belief, this Court did not hold, in the March 31, 2005 Order, that Plaintiff merely had to allege that Calpine provided a Form S-8 to Plan participants in order to sufficiently state his breach of fiduciary duty claim. Plaintiff is still required to show that the Form S-8 contained misleading statements and was disseminated to the Plan participants by Defendants while they were acting in their fiduciary capacity.[FN7] As the court stated in *In re WorldCom ERISA Litig.*, "[a] corporation and its board may wear two 'hats'-that of employer and of ERISA fiduciary. ERISA liability arises *only from actions taken or duties breached in the performance of ERISA obligations.*" *In re WorldCom ERISA Litig.*, 263 F.Supp.2d 745, 760 (S.D.N.Y.2003) (emphasis added). As such, unless Plaintiff can plead and prove that the SEC filings were disseminated to the Plan participants in a way that was meaningfully related to the Plan itself, the mere fact that Calpine filed such documents is not enough to establish ERISA liability. *Id.* (emphasizing that "SEC filings are documents that directors must execute to comply with a corporation's obligations under federal securities laws."). Indeed, other courts considering similar allegations have also held that corporate SEC filings and press releases are, as a matter of law, directed at the market as a whole and not at ERISA Plan participants. *See, e.g., Crowley ex rel. Corning, Inc. Inv. Plan v. Corning, Inc.*, 2004 WL 763873 (W.D.N.Y.2004).

> FN7. Defendants have requested that the Court take judicial notice of Calpine's Form S-8. Since the document is referenced in the Amended Complaint, and since the Court may judicially notice public filings, such as SEC documents, on a motion to dismiss, *see In re*

*Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999), Defendants' Request for Judicial Notice [Docket No. 108] is hereby GRANTED.

Nor can Plaintiff evade dismissal by relying on his theory that Calpine or the Committee Defendants breached their fiduciary duties by failing to provide certain information to the Plan participants. Plaintiff's "affirmative duty to provide information" claim was already dismissed with prejudice by this Court in the March 31, 2005 Order. See March 31, 2005 Order at 12. Plaintiff may not reassert a theory that has already been considered and soundly rejected as insufficient by this Court. See, e.g., *Baymiller v. Guarantee Mut. Life Co.*, 2000 WL 33774562 *2 (C.D.Cal.2000) (law of the case doctrine prevents plaintiff from pursuing claims against defendants in second amended complaint that were asserted in the first amended complaint and dismissed).

Finally, Plaintiff is also precluded from attempting to save his Amended Complaint from dismissal by asserting new allegations regarding the Committee Defendants and the fact that they were "high-ranking corporate officers." As a matter of law, Plaintiff cannot rely on factual allegations that are not actually contained in the instant Amended Complaint. See *Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n. 1 (9th Cir.1998). While the Court may consider whether the allegations would prove that further leave to amend would not be futile, here, given the length of time that this action has been pending, the fact that Plaintiff was provided with specific admonitions when granted leave to amend the prior Consolidated Complaint, and the overwhelming deficiencies of the current Amended Complaint that have already been set forth herein, it is quite clear to the Court that leave to amend *is* futile. *Id.* at 1197. Notably, even if certain Committee Defendants are or were high-ranking corporate officers, Plaintiff has not stated that he has any additional facts that would show that any of the officers, while acting in their fiduciary capacity, made material misstatements to the Plan participants. Indeed, with respect to the fraudulent accounting transactions purportedly committed by the Company, Plaintiff has not stated that he has any additional facts that would link such defendants to the alleged acts.

***11** Last, since Plaintiff has failed to establish that either Calpine or the Committee Defendants have breached their fiduciary duties, Plaintiff's claim of "co-fiduciary liability" necessarily fails. As such, the entire Amended Complaint is subject to dismissal. Accordingly, since Plaintiff has failed to state a claim under any cause of action alleged in the Amended Complaint, the Court finds that the parties' dispute regarding the propriety of Plaintiff's requested relief is moot.

### C. Dismissal with Prejudice

As a final matter, the Court also concludes that dismissal with prejudice is warranted. First, this case has been pending for nearly three years and is premised on conduct that occurred almost five years ago. Second, the Court held an exhaustive three-hour long hearing on the prior motions to dismiss and therefore Plaintiff was given ample notice with regard to the deficiencies of his pleadings. Despite this fact, Plaintiff has not identified a single valid reason why he has been unable to file an Amended Complaint that complies with the Court's March 31, 2005 Order. Indeed, even though Plaintiff was directed to file his Amended Complaint within thirty days of the March 31, 2005 Order, he requested-and was granted-an additional sixty days to file his Amended Complaint. Due to the significant amount of time that has passed since this action was initially filed, and the numerous opportunities Plaintiff has been granted to cure the defects in his pleadings, the state of Plaintiff's current Amended Complaint is simply inexcusable. Further, Plaintiff has not identified any facts that he could add to his Amended Complaint that would lead this Court to believe that further leave to amend would be fruitful.

### CONCLUSION

IT IS HEREBY ORDERED THAT Calpine's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [Docket No. 106] is GRANTED.
IT IS FURTHER ORDERED THAT the Committee Defendants' Motion to Dismiss the Consolidated Complaint [Docket No. 110] is GRANTED.
IT IS FURTHER ORDERED THAT Defendants' Request for Judicial Notice [Docket No. 108] is GRANTED.
IT IS FURTHER ORDERED THAT Plaintiff's Corrected Amended Consolidated Complaint [Docket No. 101] is DISMISSED WITH PREJUDICE. The Clerk is directed to close the file and to terminate any

pending matters.
IT IS SO ORDERED.
N.D.Cal.,2005.
In re Calpine Corp. ERISA Litigation
Slip Copy, 2005 WL 3288469 (N.D.Cal.), 36 Employee Benefits Cas. 1871

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.