# Exhibit 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re XEROX CORPORATION ERISA LITIGATION, | ) ) ) | Master File No. 02-CV-1138 (AWT) |
|  | ) | <u>CLASS ACTION</u> |
| This Document Relates to: | ) ) | |
|  | ) | <u>**SECOND**</u> CONSOLIDATED |
| ALL ACTIONS | ) | AMENDED COMPLAINT |
|  | ) | |
|  | ) | ~~NOVEMBER 15, 2002~~ |

For their **Second** Consolidated Amended Complaint ("Consolidated Complaint") against

Defendants, Plaintiffs' allegations are set out below.  Plaintiffs note, however, that as of the date of

this Consolidated Complaint, discovery has only just begun.  As a result, it is likely that as

discovery proceeds, the roles of now unknown co-fiduciaries and other actors in the wrongdoing

outlined below will be revealed, and Plaintiffs will then seek leave to amend this Complaint to add

new parties and/or new claims.

### I.    NATURE OF THE ACTION

1.    This is a civil enforcement action brought pursuant to § 502 of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

2.    The lawsuit concerns the Xerox Corporation Profit Sharing and Savings Plan (the

"Plan"), a retirement plan established by Xerox Corporation ("Xerox") as a benefit for its

employees to permit tax-advantaged savings for retirement and other long-term goals.  It also

concerns the Profit Sharing Plan of Xerox Corporation and the Xerographic Division, Union of

Needletrades, Industrial and Textile Employees, A.F.L. - C.I.O. - C.L.C. ("UNITE Plan"),

covering certain unionized employees.  Together the Plan and UNITE Plan may be referred to as

"Plans" where appropriate. The Plans are defined contribution plans covering most of Xerox's full and part-time employees in the United States.

3.     Plaintiffs, ~~Michael Taddonio, John Hopkins~~**David Alliet, Linda Willis,** and William Saba are participants in the Plan.

4.     Plaintiffs ~~Taddonio, Hopkins~~**Alliet, Willis,** and Saba allege that Defendants, Xerox itself and certain individuals, are fiduciaries of the Plan, and breached their fiduciary duties to them and to the other participants and beneficiaries of the Plan, in violation of ERISA § 409, 29 U.S.C. § 1109, in connection with the Plan's holdings of Xerox stock. Plaintiffs ~~Taddonio, Hopkins~~**Alliet, Willis** and Saba allege that Defendants are obliged under ERISA to make the Plan whole for the losses suffered as a result of ~~Defendant~~**Defendants**' failure to discharge their fiduciary obligations.

5.     Because the claims of Plaintiffs ~~Taddonio, Hopkins~~**Alliet, Willis** and Saba apply to the Plan participants and beneficiaries as a whole, and because ERISA authorizes participants to sue for plan-wide relief for breaches of fiduciary duty, Plaintiffs bring this action as a class on behalf of all the participants and beneficiaries of the Plan from May 12, 1997 to the present (the "Class Period").

6.     Plaintiff Thomas Patti is a participant in the UNITE Plan. Plaintiff Patti alleges that Defendants, Xerox itself and certain individuals, are fiduciaries of the UNITE Plan, and breached their fiduciary duties to him and to the other participants and beneficiaries of the UNITE Plan, in violation of ERISA § 409, 29 U.S.C. § 1109, in connection with the UNITE Plan's holdings of Xerox stock. Plaintiff Patti alleges that Defendants are obliged under ERISA to make the UNITE Plan whole for the losses suffered as a result of Defendants' failure to discharge their fiduciary obligations.

7.      Because Plaintiff Patti's claims apply to the participants and beneficiaries of the UNITE Plan as a whole, and because ERISA authorizes a participant such as Mr. Patti to sue for plan-wide relief for breaches of fiduciary duty, he brings this action as a class action on behalf of all the participants and beneficiaries of the UNITE Plan during the Class Period.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal questions) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      This Court has personal jurisdiction over the Defendants as the Court has subject matter jurisdiction under ERISA.

10.      Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and some Defendants reside in this district.  In addition, Xerox's principal executive offices are located in Stamford, Connecticut, where the day-to-day operations of the Company are directed and managed.

## III.      PARTIES

11.      Plaintiff Patti is a resident of New York.  For many years he has worked for Xerox, and is a participant in the UNITE Plan.  A substantial portion of his total savings in the UNITE Plan were invested in Xerox stock in the Xerox Stock Fund.  From 1999 to 2001, the value of this declined by approximately 88%.

12.      Plaintiff ~~Taddonio is a resident of Seminole, Florida.  He has been a participant in the Plan since 1990. His account balance in the Plan was invested in part in the Xerox Stock Fund at the relevant time(s).~~

~~13.      Plaintiff Hopkins is a resident of Kansas.   For many years he worked for Xerox,~~**Alliet is a resident of Pittsford, New York.  Mr. Alliet worked for Xerox for almost 39**

**years** and is a current participant in the Plan.  A substantial portion of his total savings in the Plan was invested in the Xerox Stock Fund. ~~From 1999 through 2001, the value of this stock dropped approximately 88%~~ **during the Class period.**

**13.    Plaintiff Willis is a resident of Summerville, South Carolina.  She worked for Xerox for more than 25 years and was a participant in the Plan during the Class period.  A substantial portion of her total savings in the Plan was invested in the Xerox Stock Fund during the Class period**.

14.    Plaintiff Saba is a resident of Connecticut.  Plaintiff worked for Xerox for many years, and is a participant in the Plan.  A substantial portion of his total savings in the Plan was invested in the Xerox Stock Fund.  Since April 12, 2000 the value of this stock dropped over 70%.

15.    Defendant Xerox is a New York corporation with its principal place of business and chief executive offices located at Stamford, Connecticut.

16.    Defendant Lawrence Becker ("Becker") served as the "Plan Administrator" of the Plan at times during the Class Period.

17.    Defendant Sally Conkright ("Conkright") served as the "Plan Administrator" of the Plan at times during the Class Period.

18.    Defendant Patricia M. Nazemetz ("Nazemetz") served as the "Plan Administrator" of the Plan at times during the Class Period.

19.    Defendant Arlyn B. Kaster ("Kaster") served as the "Plan Administrator" of the UNITE Plan at times during the Class Period.  Defendants Becker, Conkright, Nazemetz and Kaster are referred to herein as the "Plan Administrator Defendants."

20.    Defendants Myra R. Drucker ("Drucker"), Kathleen Russell ("Russell"), William Strusz ("Strusz"), Conkright, William Roscoe ("Roscoe"), Becker, Kaster and Lance Davis

("Davis") were Xerox appointees to the Joint Administrative Board ("JAB") for the UNITE Plan during the Class Period.

21. The following Defendants were members of the Fiduciary Investment Review Committee during the Class Period: Gregory B. Tayler ("Tayler"), Christina Clayton ("Clayton"), Gary Kabureck ("Kabureck"), Davis, and Lawrence Zimmerman ("Zimmerman").

~~22. Defendants John Does 1-30 are residents of the United States and are or were members of the Xerox Finance Committee or the Xerox Fiduciary Investment Review Committee, or Xerox representatives on the JAB for the UNITE Plan during the Class Period. Their identity is currently unknown to Plaintiffs. Once their identity is discovered, Plaintiffs will seek leave to amend to join them under their true names.~~

**22.** ~~23.~~ Defendant Eunice M. Filter ("Filter") was the Treasurer of Xerox at times during the Class Period.

**23.** ~~24.~~ Defendant Tayler was the Treasurer of Xerox at times during the Class Period.

**24.** ~~25.~~ The following Defendants were members of the Board of Directors of Xerox at times during the Class Period: Paul A. Allaire ("Allaire"), Anne M. Mulcahy ("Mulcahy"), ~~Antonia Axison Johnson ("Johnson") John D. Macomber ("Macomber"),~~ William F. Buehler ("Buehler"), ~~Yotaro Kobayashi ("Kobayashi"),~~ Barry D. Romeril ("Romeril"), Lawrence Becker ("Becker"), B.R. Inman ("Inman"), Vernon E. Jordan~~,~~ ("Jordan")**,** Jr., Hilmar Kopper ("Kopper"), ~~Ralph S. Larsen ("Larsen"),~~ George J. Mitchell ("Mitchell"), N.J. Nicholas, Jr. ("Nicholas"), ~~John E. Pepper ("Pepper"),~~ Patricia F. Russo ("Russo"), Martha R. Seger ("Seger"), Thomas C. Theobald ("Theobald"), and G. Richard Thoman ("Thoman"). They are named here both individually and as constituting the Board of Directors of Xerox during the Class Period. These Defendants are referred to collectively as the "Director Defendants."

26.    ~~Richard Roes 1-30 are residents of the United States and are or were members of the Company's Board of Directors during the Class Period. Their identity is now unknown to Plaintiff. Once their identity is discovered, Plaintiff will seek leave to amend to join them under their true names.~~

**25.**    ~~27.~~ The following Director Defendants were also, at times during the Class Period, members of the Xerox Board's Finance Committee: Inman, Jordan, Mitchell, Nicholas, Seger, Theobald, Russo and Kopper.

### IV.    APPROPRIATENESS OF CLASS ACTION

**26.**    ~~28.~~ Plaintiffs ~~Taddonio, Hopkins~~**Alliet, Willis,** and Saba bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class ("Plan Class") of all persons similarly situated. The Plan Class consists of all persons who were participants in or beneficiaries of the Plan, excluding the Defendants, at any time during the Class Period, and who made or maintained investments in the Xerox Stock Fund.

**27.**    ~~29.~~ Plaintiff Patti brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class ("UNITE Class") of all persons similarly situated. The UNITE Class consists of all persons who were participants in or beneficiaries of the UNITE Plan, excluding the Defendants, at any time during the Class Period, and who made or maintained investments in the Xerox Stock Fund.

**28.**    ~~30.~~ Pursuant to Fed. R. Civ. P. 23(b), Plaintiffs meet the prerequisites to bring this action on behalf of their respective Classes because:

- **Numerosity.** The Plan Class consists of over 50,000 individuals and is so numerous that joinder of all members as individual Plaintiffs is impracticable. The UNITE Class consists of over 4,000 individuals.

- **Commonality.**  These are questions of law and fact common to the Plan Class and the UNITE Class.

- **Typicality.**  The Plaintiffs' claims are typical of the claims of their respective classes.

- **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the Plan Class and the UNITE Class.  They have no interests that are antagonistic to or in conflict with the interest of their respective class as a whole, and have engaged competent counsel, experienced in class actions and complex litigation.

**29.**  ~~31.~~ Pursuant to Fed. R. Civ. P. 23(b), this action is maintainable as a class action for the following independent reasons:

1.    The prosecution of separate actions by the members of the class would create a risk of inconsistent or varying adjudications with respect to the individual members of the class, which would establish incompatible standards of conduct for Defendants.  Fed. R. Civ. P. 23(b)(1)(A).

2.    The prosecution of separate actions by the members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.  Fed. R. Civ. P. 23(b)(1)(B).

3.    The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

4.    Questions of law and fact common to members of the class predominate over any questions affecting only individual members, and the class action is superior to other

available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). This case presents numerous common questions of law and fact including:

(a)    Whether Defendants' communications to participants provided "complete and accurate" information concerning the risks of investing in Xerox stock as part of their retirement;

(b)    Whether Defendants provided false and misleading information, or failed to disclose material information, concerning the financial health of the Company;

(c)    Whether Defendants took sufficient steps to investigate and monitor whether it was appropriate to continue to offer Company stock as a retirement vehicle for participants;

(d)    Whether Defendants took ~~appropriate actions to identify and resolve conflicts of interest and/or to communicate those conflicts to participants;~~

~~(e)    Whether Defendants took~~ adequate steps to protect the Plans' assets and recover the Plans' damages; **and**

**(e)**    ~~(f)~~ Whether Defendants took adequate steps to prudently manage the Plans' assets solely in the interest of the participants and beneficiaries, including by diversifying the investments of the Plans so as to minimize the risk of large losses.

**30.**    ~~32.~~ There are one or more putative or certified class action securities cases pending against Xerox and other defendants. The claims herein are under ERISA and related principles of federal common law and are not being asserted by the plaintiffs in those other class actions. The named plaintiffs in those class actions do not adequately represent the Plaintiffs or the Classes herein with respect to ERISA claims and may be subject to defenses and limitations of liability under the PSLRA and other statutes and rules that do not apply to the claims asserted herein.

## V.     FACTUAL ALLEGATIONS

### A.     The Plan.

**31.**     ~~33.~~ Upon information and belief, the Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  Pursuant to ERISA, the relief requested in this action is for the benefit of the Plan and the UNITE Plan.

**32.**     ~~34.~~ Xerox is the sponsor of the Plan.  Its Sponsor Identification Number is 16-0468020 and the Plan Number is 001.  The Plan was established in 1945.  Xerox also sponsors the UNITE Plan.  Its plan number is 002.  The UNITE Plan was established in 1964.

**33.**     ~~35.~~ Subject to Internal Revenue Service limitations, participants of the Plan and the UNITE Plan were permitted to contribute up to 18% of pay to the Plan or UNITE Plan, respectively.  Pursuant to the terms of the Plans, Participants directed the investment of their contributions to various investment options available in the Plans.

**34.**     ~~36.~~ Most of these options were diversified mutual funds.  However, the options also included the Xerox Stock Fund.  The Xerox Stock Fund invested in company stock, with a small portion in cash equivalents for administrative purposes.

**35.**     ~~37.~~ Subject to "restructuring" from time to time, the Xerox Stock Fund was one of ten investment funds maintained under a Master Trust, which participated in investment "pools." According to Plan ~~11~~**1 1**k Annual Reports, Master Trust investment decisions, i.e., the investments within each fund option, including those in the Xerox Stock Fund, were managed and directed by Plan fiduciaries, including Xerox, the Treasurer of Xerox, and the Finance Committee of the Xerox Board of Directors.  According to UNITE Plan ~~11~~**1 1**k Annual Reports, the Joint

Administrative Board, including representatives of Xerox, approved overall investment strategy for the UNITE Plan.  In addition, the Xerox Treasurer chaired the Fiduciary Investment Review Committee, which was and is composed of corporate officers who oversee the management of the funds and approve the overall investment strategy of the Plan.

**B.     Defendants' Fiduciary Status.**

**36.**     38.  During the Class Period, Defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as described herein.

**37.**     39.  **Named fiduciary.**  ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

**38.**     40.  ***De Facto* fiduciary.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) (stating that a person is a fiduciary "to the extent...he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets....").

**39.**     41.  In addition, under ERISA, in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the fiduciary breaches described below, for equitable relief including restitution pursuant to § 502(a)(3), 29 U.S.C. § 1132(a)(3) of ERISA.

**40.**     42.  Upon information and belief, Defendants include named and *de facto* fiduciaries with respect to the Plan and/or UNITE Plan.  All Defendants exercised discretionary authority or discretionary control respecting management of such Plans; and/or exercised authority

or control respecting management or disposition of the Plans' assets; and/or had discretionary authority or discretionary responsibility in the administration of the Plans.  29 U.S.C. § 1002(21)(A), as described herein.

**41.**    43. Instead of delegating fiduciary responsibility for the Plan to external service providers, Xerox chose to comply with the requirement of section 402(a)(1) by internalizing the fiduciary function.  It did so in various ways.

**42.**    44. During the Class Period, Xerox designated the Plan Administrator Defendants in one or more of the Plans' Annual Reports, thereby rendering them ***named fiduciaries*** of the Plans under ERISA. At the same time that they served as Plan Administrators, the Plan Administrator Defendants also were Xerox employees acting on behalf of their employer in the course and scope of their employment.  Therefore, under ERISA their fiduciary status is attributed to Xerox.

**43.**    45. During the Class Period, Xerox designated its Treasurers, Defendants Filter and Tayler, to direct investment management for the Master Trust investments.  These Defendants therefore were Plan fiduciaries under ERISA.

**44.**    46. The Finance Committee of Xerox's Board of Directors was responsible for establishing Plan investment objectives and policies, and reviewing the Treasurer and Master Trust investments.  It was a named fiduciary under the Plan.

**45.**    47. Upon information and belief, during the Class Period, the Board of Directors of Xerox, and its individual members—the Director Defendants and John Roe Defendants, had the fiduciary responsibility to appoint and monitor the members of the Finance Committee and the Treasurer of Xerox.  The Fiduciary Investment Review Committee, comprised of Xerox corporate officers and chaired by the Xerox Treasurer, also had the obligation to oversee the management of

the Plan funds on a regular basis. Thus, the Board and its members, the Finance Committee and its members, and the Fiduciary Investment Review Committee and its members, performed fiduciary functions, and thereby also acted as Plan fiduciaries under ERISA with respect to the Plan.

**46.** 48. Pursuant to the UNITE Plan, representatives of Xerox functioned on the Joint Administrative Board, which (i) approved investment strategy for the UNITE Plan, (ii) was a named Plan Administrator under the UNITE Plan, and (iii) was a named fiduciary of the UNITE Plan. The Fiduciary Investment Review Committee, comprised of Xerox corporate officers and chaired by the Xerox Treasurer, also had the obligation to oversee the management of the UNITE Plan funds on a regular basis. Thus, Xerox members of the Joint Administrative Board, the Xerox Treasurer, members of the Fiduciary Investment Review Committee, and Xerox itself acted as Plan fiduciaries under ERISA with respect to the UNITE Plan.

**47.** 49. During the Class period, and before, Defendants' direct and indirect fiduciary communications with Plan and UNITE Plan participants included material misrepresentations and omissions which caused participants to continue to direct the purchase and holding of investments in the Xerox Stock Fund in the UNITE Plan and the Plan. These communications included but were not limited to SEC filings (which were incorporated by reference into the Form S-8 Registration Statements filed with the SEC), and annual reports. These communications were made by Defendants to Plan and UNITE Plan participants in the Defendants' capacities as ERISA fiduciaries, and Xerox thereby also acted as a fiduciary under ERISA to the extent of this activity.

**C.    Xerox's Improper Accounting Practices, And Artificial Inflation Of Stock Value.**

**48.** 50. Upon information and belief, during the Class Period, and before, Xerox and its executive officers and directors knew or should have known about numerous questionable and potentially unlawful practices that made Xerox's stock an inappropriate Plan investment. These

practices, which have now been widely reported in the financial press, included, but were not limited to, the following:

(a)    The manipulation of earnings over a five-year period, including using a variety of improper accounting techniques to accelerate the recognition of some $6.4 billion in equipment revenue from 1997 through 2001, and resulting in the need for Xerox to restate its earnings for the years 1997 to 2001.

(b)    Creating and maintaining an "off the rails" corporate culture which accepted accounting manipulations and failures to cooperate with federal investigators as a way of corporate life.

(c)    Engaging in "earnings management" techniques, which were designed to and did disguise the company's true performance, including improper use of so-called "pro forma" reports.

## D.    Defendants' Materially False And Misleading Financial Results Are Reported To Unsuspecting Employees And The Market.

**49.**    ~~51.~~ Beginning in 1997, Defendants caused, allowed, and failed to correct systematic misrepresentations of Xerox financial results by manipulating earnings over a five-year period through the use of a variety of improper accounting techniques. These techniques include premature recognition of long-term copier-leasing contract revenue, failure to disclose one-time sales of receivables, and manipulation of reserves to help meet securities analysts' earnings expectations. Ultimately, it was revealed that the Company had improperly booked $6.4 billion of equipment revenue, and materially overstated its pretax income by 36%, or $1.4 billion, between 1997 and 2001 in violation of generally accepted accounting principals. When discovered, the Company was forced to restate its financial statements from 1997 to 2001 and reverse

approximately $1.9 billion of service, rental and finance revenue and pay a record $10 million fine to the SEC.

**50.** ~~52.~~ Through causing, allowing, or failing to correct the misrepresentations and omissions described below, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Xerox stock, one of the investment options of the Plans. This duty includes both a negative duty not to misinform, and an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful. Additionally, through causing, allowing, or failing to correct misrepresentations and omissions described below, Defendants breached their fiduciary duties to monitor Xerox stock and ensure that it is a prudent investment, and breached their fiduciary duty to avoid conflicts of interest.

**51.** ~~53.~~ On February 19, 1997, the Company filed a Form S-8 Registration Statement, registering 6,874,636 shares of Xerox common stock to be issued to participants of the Plan (the "Plan S-8"). The Plan S-8 was signed by Martin S. Wagner, Attorney-in-Fact, on behalf of ~~Defendants:~~**Defendant** Allaire~~,~~ Romeril, Inman, ~~Johnson, Larsen, Macomber,~~ Nicholas, ~~Pepper,~~ Seger, and Theobald. The Plan S-8 was also signed by Defendant Nazemetz, Plan Administrator. The Plan S-8 expressly incorporated by reference all of the documents filed by the Company with the SEC under the federal securities laws, including the Company's most recent and future annual, quarterly, and other periodic reports.

**52.** ~~54.~~ Also on February 19, 1997, the Company filed a Form S-8 Registration Statement, registering 560,841 shares of Xerox common stock to be issued to participants of the UNITE Plan (the "UNITE S-8"). The UNITE S-8 was signed by Martin S. Wagner, Attorney-in-Fact, on behalf of the following Defendants: Allaire, Romeril, Inman, ~~Johnson,~~ ~~Larsen, Macomber,~~ Nicholas, ~~Pepper,~~ Seger, and Theobald. The UNITE S-8 was also signed by

Defendant Nazemetz, Plan Administrator. The UNITE S-8 expressly incorporated by reference all of the documents filed by the Company with the SEC under the federal securities laws, including the Company's most recent and future annual, quarterly, and other periodic reports.

**53.** 55. Commencing in 1997, however, the Company's financial statements and other documents filed with the SEC and incorporated by reference into the Company's Form S-8 Registration Statements provided to Plan participants, contained materially false and misleading statements and omitted to disclose material information concerning the Company's improper accounting practices, in breach of Defendants' fiduciary duties to participants in the Plans.

**54.** 56. These filings contained at least the following material misrepresentations and/or omitted the following material information concerning the Company's financial condition:

(a) The Company improperly accounted for equipment sales and leasing revenues, in violation of Statement of Financial Accounting Standards No. 13 "Accounting for Leases" (SFAS No. 13);

(b) The Company improperly accounted for its sales of receivables transactions;

(c) The Company applied inappropriate accounting methodologies to consolidation of its South African affiliate;

(d) The Company improperly accounted for purchase accounting reserves in connection with the Company's 1998 acquisition of XL Connect Solutions, Inc.;

(e) Defendants improperly recorded certain restructuring reserves during 1998 and 2000 associated with the Company's decisions to exit certain business activities;

(f) The Company engaged in improper accounting practices relating to tax refunds;

(g)     The Company's income and assets were overstated due to improper revenue recognition and other accounting improprieties in violation of Generally Accepted Accounting Principles; and

(h)     The Company's stock was trading at inflated prices due to the Company's improper revenue recognition and other accounting improprieties.

**55.** ~~57.~~ On May 12, 1997, the Company filed its Form 10-Q for the quarter ended March 31, 1997 (the "First Quarter 1997 Form 10-Q"). The First Quarter 1997 Form 10-Q reported the following:

> Income from continuing operations increased 14 percent to $270 million in the 1997 first quarter from $237 million in the 1996 first quarter.
>
> Revenues grew 5 percent on a pre-currency basis to $4.1 billion in the first quarter, driven by 10 percent growth in equipment sales (excluding OEM sales) and 41 percent growth in document outsourcing. Service, paper and rental revenues declined from the first quarter of 1996. Paper price declines reduced overall revenue growth by over one percentage point.
>
> Fully diluted earnings per share increased 15 percent to $0.75 in the first quarter compared with $0.65 in the 1996 first quarter.
>
> ...
>
> Other Areas include operations principally in Latin America, Canada and China. Mexico and China had excellent revenue growth in the first quarter, Brazil had modest growth, following exceptional copier equipment sales growth in the 1996 fourth quarter, and revenues declined in the rest of Latin America due to difficult economic environments in a number of countries. Our 1996 full year revenues in Brazil were approximately $1.6 billion.

**56.** ~~58.~~ The First Quarter 1997 Form 10-Q further stated that:

> The...financial statements presented herein have been prepared by Xerox Corporation ("the Company") in accordance with the accounting policies described in its [most recent] Annual Report to Shareholders and should be read in conjunction with the notes thereto [which state that the Company's financial statements were

prepared in accordance with GAAP]....In the opinion of management, all adjustments (consisting only of normal recurring adjustments) which are necessary for a fair statement of operating results for the interim periods presented have been made.

**57.** ~~59.~~ On August 7, 1997, the Company filed its Form 10-Q for the quarter ended June 30, 1997 (the "Second Quarter 1997 Form 10-Q"). The Second Quarter 1997 Form 10-Q reported the following:

Income from continuing operations increased 15 percent from $293 million in the 1996 second quarter to $337 million in the 1997 second quarter, including $13 million as a result of the acquisition of the Rank Group's remaining interest in Rank Xerox in June.

Revenues of $4.4 billion in the quarter represented 6 percent growth on a pre-currency basis. After the adverse effect of currency, revenue growth was 3 percent. The pre-currency revenue growth was driven by strong growth in equipment sales (excluding OEM sales) and continued excellent growth in document outsourcing.

Fully diluted earnings per share increased 16 percent to $0.94 in the second quarter including $0.04 as a result of the Rank Xerox transaction.

…

Other Areas include operations principally in Latin America, Canada and China. Brazil had strong revenue growth in the 1997 second quarter reflecting excellent growth in equipment sales and document outsourcing. Revenue growth was also excellent in Mexico, but the smaller Latin American countries such as Chile, Venezuela and Colombia continue to be impacted by difficult economic conditions. Revenue growth in Canada and China was good in the second quarter.

**58.** ~~60.~~ The Second Quarter 1997 Form 10-Q also provided information concerning the Company's acquisition of 20% of Xerox Limited, previously held by the Rank Group PLC:

In June, 1997, we acquired the remaining 20 percent of Rank Xerox Limited (Rank Xerox) from The Rank Group Plc (Rank) in a transaction valued at 940 million pounds sterling, or approximately $1.5 billion. As a result of this transaction, we now own 100 percent of Rank Xerox. The transaction was funded entirely by debt consisting of 500 million pounds sterling of third party debt and 440

million pounds sterling of notes payable issued to Rank, which will be paid in deferred installments, half within one year and the other half at the end of two years.  An additional payment of up to 60 million pounds sterling would be made in 2000 based upon achievement of certain Rank Xerox earnings growth targets by 1999. The purchase price was allocated such that goodwill increased by $737 million, minority interest in equity of subsidiaries was reduced by approximately $720 million, with the balance of $70 million applied to other assets and liabilities, primarily investment in affiliates, at equity.

**59.**    61. On November 11, 1997, the Company filed its Form 10-Q for the quarter ended

September 30, 1997 (the "Third Quarter 1997 Form 10-Q").  The Third Quarter 1997 Form 10-Q

reported the following:

> Income from continuing operations increased 28 percent to $320 million in the 1997 third quarter from $250 million in the 1996 third quarter.   For the first nine months, income from continuing operations increased 19 percent to $927 million.
>
> Revenues of $4.4 billion in the quarter represented 9 percent growth on a pre-currency basis.  After the adverse effect of currency, revenue growth was 5 percent.  The pre-currency revenue growth was driven by 21 percent growth in equipment sales (excluding OEM sales) and 31 percent growth in document outsourcing.  For the first nine months, revenues of $12.8 billion represented 6 percent growth on a pre-currency basis or 4 percent after the adverse effect of currency.  Fully diluted earnings per share increased 29 percent to $0.88 in the third quarter.  For the first nine months of 1997, fully diluted earnings per share increased 20 percent to $2.57.
>
> ...
>
> Other Areas include operations principally in Latin America, Canada and China.  Brazil had strong revenue growth in the 1997 third quarter reflecting excellent growth in equipment sales and document outsourcing.  Revenue growth was also excellent in Mexico, but smaller Latin American countries such as Chile and Venezuela continue to be impacted by difficult economic conditions. Revenues in Canada and China were essentially flat in the third quarter.

**60.**    62. The Company's First through Third Quarter 1997 Forms 10-Q, which were

incorporated by reference into the Form S-8 Registration Statements filed with the SEC pertaining

to stock issued under the Plans included material omissions with respect to the Company's financial results and prospects. These omissions included, without limitation, the fact that Xerox did not prepare its financial statements in accordance with GAAP, that Xerox did not maintain adequate internal controls or adequate internal structure, the Company improperly accounted for equipment sales and leasing revenues, in violation of SFAS 13, that the Company improperly accounted for its sales of receivables transactions, that Xerox's financial results included a $100 million reserve which was improperly established in connection with the Company's acquisition of the Rank Group's 20% interest in Xerox Limited, and the other improprieties described herein, all of which resulted in the material overstatement of income and assets throughout the Class Period.

**61.** ~~63.~~ On March 23, 1998, the Company filed its 1997 Form 10-K (the "1997 Form 10-K"), signed by the following Defendants: Romeril, Allaire, Inman, ~~Johnson, Kobayashi, Larsen, Macomber,~~ Mitchell, Nicholas, Russo, Seger, Theobald, and Thoman~~.~~. As set forth in the 1997 Form 10-K, the Company reported $18.166 billion in revenue, $2.14 billion in income before income taxes, and net income of $1.452 billion. Basic earnings per share were reported to be $4.31, while diluted earnings per share were reported to be $4.04.

**62.** ~~64.~~ The 1997 Form 10-K contained the following "Report of Management" attesting to the adequacy of Xerox's accounting controls:

> Report of Management
>
> Xerox Corporation management is responsible for the integrity and objectivity of the financial data presented in this annual report. *The consolidated financial statements were prepared in conformity with generally accepted accounting principles and include amounts based on management's best estimates and judgments.*
>
> The Company maintains an internal control structure designed to provide reasonable assurance that assets are safeguarded against loss or unauthorized use and that financial records are adequate and

can be relied upon to produce financial statements in accordance with generally accepted accounting principles. This structure includes the hiring and training of qualified people, written accounting and control policies and procedures, clearly drawn lines of accountability and delegations of authority. In a business ethics policy that is communicated annually to all employees, the Company has established its intent to adhere to the highest standards of ethical conduct in all of its business activities.

The Company monitors its internal control structure with direct management reviews and a comprehensive program of internal audits. In addition, KPMG Peat Marwick LLP, independent auditors, have audited the consolidated financial statements and have reviewed the internal control structure to the extent they considered necessary to support their report, which follows.

The Audit Committee of the Board of Directors, which is composed of outside directors, meets regularly with the independent auditors, the internal auditors and representatives of management to review audits, financial reporting and internal control matters, as well as the nature and extent of the audit effort. [Emphasis supplied.]

**63.**   65. The Reports of Management contained in the Company's annual financial statements filed with the SEC in 1998 and 1999 on form 10-K contained substantially similar statements. In fact, the financial statements were not prepared in conformity with GAAP, the Company failed to maintain an adequate internal control structure, its financial records were inadequate and could not be relied upon to produce financial statements in accordance with generally accepted accounting principles, and the Company did not adequately monitor and audit its internal operations.

**64.**   66. In its 1997 Form 10-K, the Company reported that revenue in its "Other Areas," principally comprised of Mexico, Latin America, Canada, and China, grew 8% pre-currency adjustment, or more than any other geographical region. The Company stated:

Other Areas 1997 revenue reflects good growth in Brazil and China, modest growth in Canada, and excellent growth in Mexico. Revenues in Brazil were $1.8 billion in 1997, $1.6 billion in 1996 and $1.3 billion in 1995. [Emphasis supplied.]

**65.** ~~67.~~ Also in the 1997 Form 10-K, under the heading "Revenue Recognition," the Company described the manner in which it recognized revenues pursuant to its installment contracts and sales-type leases:

> Revenues from the sale of equipment under the installment contracts and from sales-type leases are recognized at the time of sale or at the inception of the lease, respectively. Associated finance income is earned on an accrual basis under an effective annual yield method. Revenues from equipment under other leases are accounted for by the operating lease method and are recognized over the lease term. *Service revenues are derived primarily from maintenance contracts on our equipment sold to customers and are recognized over the term of the contracts.* [Emphasis supplied.]

**66.** ~~68.~~ Additionally, the Company described its accounting policies for determining provisions for losses on uncollectible receivables as follows:

> Provisions for Losses on Uncollectible Receivables. The provisions for losses on uncollectible trade and finance receivables are determined principally on the basis of past collection experience.

**67.** ~~69.~~ The statements identified from the 1997 Form 10-K were materially false and misleading when made and/or omitted to disclose material facts due to the fact that, *inter alia*:

> The Company did not prepare its financial statements in accordance with GAAP;
>
> The Defendants knew or should have known that the Company's reported financial results were materially inflated by the improper accounting activities identified herein;
>
> The Company's purported growth in Mexico and Brazil was, in significant part, the product of the improper accounting;
>
> The Defendants knew or should have known that Xerox Mexico recorded revenues from inflated and/or fictitious invoices which resulted in uncollectible receivables for which inadequate reserves were established;
>
> The 1997 financial results improperly included a $100 million reserve which was improperly established in connection with the Company's acquisition of a 20% interest in Xerox Limited from The Rank Group Plc.

**68.** 70. On August 13, 1998, the Company filed its Form 10-Q for the quarter ended June 30, 1998 (the "Second Quarter 1998 Form 10-Q"). The Second Quarter Form 10-Q reported that:

> Income from continuing operations, before restructuring charges, increased 17 percent to $395 million in the 1998 second quarter from $337 million in the 1997 second quarter. Including a $1,107 million after-tax charge in connection with the previously announced worldwide restructuring program, the second quarter net loss was $712 million.

> Revenues of $4.7 billion in the quarter represented 10 percent growth on a pre-currency basis, *the third consecutive quarter of double-digit revenue growth*. The pre-currency revenue growth was driven by 19 percent growth in equipment sales (excluding OEM sales). After the adverse effect of currency, revenue growth was 9 percent.

> Diluted earnings per share from continuing operations increased 16 percent to $1.09 in the second quarter excluding the restructuring charge.

> For the first six months of the year, diluted earnings per share from continuing operations, before the restructuring charge, increased 14 percent to $1.93 and income from continued operations increased 15 percent to $697 million. Including the restructuring charge, Xerox reported a first-half net loss of $600 million, or a loss of $1.90 per share.

> Revenues in the first half of 1998 were $9 billion, compared with $8.4 billion a year ago.

> ...

> Other Areas include operations principally in Latin America, Canada and China. Growth in Other Areas during the 1998 second quarter was driven by good equipment sales and strong document outsourcing growth....Brazil's profits declined for the second quarter and first half of 1998, however, we are anticipating modest economic growth in Brazil and on that basis, *expect modest profit growth in our Brazilian affiliate in the second half of 1998. Canada, Mexico and a number of the smaller Latin American affiliates including Argentina and Chile had excellent growth in the second quarter.* [Emphasis supplied.]

**69.** 71. On November 10, 1998, the Company filed its Form 10-Q for the quarter ended September 30, 1998 (the "Third Quarter 1998 Form 10-Q"). The Third Quarter 1998 Form 10-Q stated:

> Income from continuing operations increased 19 percent to $381 million in the 1998 third quarter from $320 million in the 1997 third quarter, primarily as a result of outstanding growth in digital product revenues and improved operating profit margins, including the initial benefits from the worldwide restructuring program.
>
> Third quarter 1998 revenues of $4.6 billion were affected by weaker global economic conditions, growing 6 percent on a pre-currency basis. Weakness in Brazil and Russia alone reduced pre-currency revenue growth by 2 percentage points in the quarter.
>
> Diluted earnings per share from continuing operations increased 18 percent to $1.05 in the third quarter.
>
> For the first nine months of the year, excluding the restructuring charge, diluted earnings per share from continuing operations increased 16 percent to $2.98 and income from continuing operations increased 16 percent to $1,078 million. Including the restructuring charge and the loss from discounted operations, Xerox reported a net loss of $219 million for the first nine months of 1998, or a net loss of $0.77 per share.

In describing its business in "Other Areas," the Company stated:

> Other Areas include operations principally in Latin America, Canada, China and Russia. Revenue in Brazil declined by 10 percent in the 1998 third quarter as customers deferred purchases due to the weak economic environment, although there was modest growth in digital product revenues....Canada and a number of the smaller Latin American affiliates, including Argentina and Colombia, had good revenue growth in the third quarter. Revenue in Other Areas grew 4 percent during the first nine months of 1998. *Revenue growth in Canada and Mexico was strong while revenue in Brazil declined modestly.* [Emphasis supplied.]

**70.** 72. The Company's First through Third Quarter 1998 Forms 10-Q, which were incorporated by reference into the Form S-8 Registration Statements filed with the SEC pertaining to stock issued under the Plans included material omissions with respect to the Company's

- 23 -

financial results and prospects.  These omissions included, without limitation, the fact that Xerox

did not prepare its financial statements in accordance with GAAP, that Xerox did not maintain

adequate internal controls or adequate internal structure, the Company improperly accounted for

equipment sales and leasing revenues, in violation of SFAS 13, that the Company improperly

accounted for its sales of receivables transactions and the other improprieties described herein.

Moreover, in 1998, the Company had, unbeknownst by investors, improperly accounted for

purchase accounting reserves in connection with the Company's 1998 acquisition of XL Connect

Solutions, Inc. and improperly recorded certain restructuring reserves during 1998 associated with

the Company's decisions to exit certain business activities.  All of these actions resulted in the

material overstatement of income and assets throughout the Class Period.

**71.**    ~~73.~~ On March 22, 1999, the Company filed its Annual Report on Form 10-K for the

year ended December 31, 1998 (the "1998 Form 10-K").   This document was signed by

Defendants Romeril, Allaire, Inman, ~~Johnson,~~ Jordan, Kopper, ~~Larsen,~~ Mitchell, Nicholas, ~~Pepper,~~

Russo, Seger, Theobald, and Thoman, and reported the following:

> Document Processing revenues, which grew 8 percent on a
> pre-currency basis to $19.4 billion in 1998, were affected by some
> weaker economies.   Excluding Brazil and Russia, pre-currency
> revenues grew 10 percent.  Total pre-currency revenue growth was
> driven by 12 percent growth in equipment sales and 25 percent
> growth in document outsourcing (excluding equipment accounted
> for as sales)....Revenues increased 7 percent on a pre-currency basis
> to $18.1 billion in 1997 and 6 percent on a pre-currency basis to
> $17.4 billion in 1996.
>
> ***
>
> Income from continuing operations increased 17 percent in 1998,
> excluding the impact of a $1,107 million after-tax restructuring
> charge, and 20 percent in 1997.
>
> Diluted earnings per share from continuing operations increased 16
> percent in 1998, excluding the restructuring charge, and 22 percent

in 1997.   Earnings per share have been adjusted to reflect the 2–-for–-1 stock split to shareholders of record on February 4, 1999.

In describing the geographical distribution of its revenues, the Company's 1998 Form 10-K disclosed:

Other Areas 1998 revenue reflected a 7 percent decline in Brazil due to the difficult economic environment.   Revenues in Brazil were $1.6 billion in 1998, $1.8 billion in 1997, and $1.6 billion in 1996....Growth in Canada and Mexico was strong in 1998.   1997 revenue growth reflects good growth in Brazil and China, modest growth in Canada, *and excellent growth in Mexico.*   [Emphasis supplied.]

**72.**   ~~74.~~ With respect to its accounts receivable, the Company stated the following:

Inventories and receivables grew by $1571 million in 1998, or $866 million more than in 1997.   The higher level of inventory investment was driven by accelerated digital product sales growth. Accounts receivable growth reflects strong equipment sales in 1998 and some increase in days sales outstanding due to temporary effects from the reorganization and consolidation of U.S.  customer administrative centers.

Under the heading "Provisions for Losses on Uncollectible Receivables," the Notes to the Consolidated Financial Statements contained in the 1998 Form 10-K stated:

Provisions for Losses on Uncollectible Receivables.  The provisions for losses on uncollectible trade and finance receivables are determined principally on the basis of past collection experience.

The Notes to the Company's Consolidated Financial Statements revealed the following under the caption "Revenue Recognition":

Revenues from the sale of equipment under installment contracts and from sales-type leases are recognized at the time of sale or at the inception of the lease, respectively.  Associated finance income is earned on an accrual basis under an effective annual yield method. Revenues from equipment under other leases are accounted for by the operating lease method and are recognized over the lease term. *Service revenues are derived primarily from maintenance contracts on our equipment sold to customers and are recognized over the term of the contracts.*  [Emphasis supplied.]

**73.**   ~~75.~~ The statements contained in the 1998 Form 10-K were materially false and misleading when made and/or omitted to disclose material facts due to the fact that, *inter alia*:

The Company did not prepare its financial statements in accordance with GAAP;

The Defendants knew or should have known that the Company's reported financial results were materially inflated by the improper accounting activities identified herein;

The Company's purported growth in Mexico and Brazil was, in significant part, the product of the improper accounting;

The Defendants knew or should have known that Xerox Mexico recorded revenues from inflated and/or fictitious invoices which resulted in uncollectible receivables for which inadequate reserves were established;

The Company improperly accounted for purchase accounting reserves in connection with the Company's 1998 acquisition of XL Connect Solutions, Inc.; and

Defendants improperly recorded certain restructuring reserves associated with the Company's decisions to exit certain business activities.

**74.** ~~76.~~ On May 14, 1999, the Company filed its Form 10-Q for the quarter ended March 31, 1999 (the "First Quarter 1999 Form 10-Q"). The First Quarter 1999 Form 10-Q described Xerox's quarterly results as follows:

Income from continuing operations increased 14 percent to $343 million in the 1999 first quarter from $301 million in the 1998 first quarter. The increase was primarily due to improved operating margins that reflected ongoing benefits from the company's worldwide restructuring program and a heightened focus on productivity and expense controls. The productivity and expense control actions included significant cost reductions in our Brazilian operations, encompassing branch consolidations and centralization of administrative support functions, as well as additional worldwide cost constraints.

Pre-currency revenues, excluding Brazil, grew 3 percent, reflecting revenue growth of 4 percent in the United States and 2 percent in Europe. U. S. and European revenue growth was depressed in the 1999 first quarter, reflecting the impact of the implementation of initiatives announced in January 1999 to provide industry-oriented global document solutions for major customers. These initiatives required substantial one-time investments, including enhanced sales

training and development and some changes in customer relationships, which impacted first quarter sales productivity more than anticipated. Including Brazil and the effects of currency, revenues of $4.3 billion were flat compared with the first quarter of 1998.

Diluted earnings per share from continuing operations increased 14 percent to $0.48 in the 1999 first quarter from $0.42 in the 1998 first quarter.

**75.** 77. In describing its geographical distribution of revenues, the Company's First Quarter 1999 Form 10-Q stated:

China, the Middle East and Africa had strong revenue growth in the first quarter, Canada and *Mexico had good revenue growth,* while revenue declined in Argentina, Venezuela and Russia due to economic weakness. [Emphasis supplied.]

**76.** 78. On August 11, 1999, the Company filed its Form 10-Q for the quarter ended June 30, 1999 (the "Second Quarter 1999 Form 10-Q"). The Second Quarter 1999 Form 10-Q described Xerox's quarterly results as follows:

Income increased 13 percent to $448 million in the 1999 second quarter for $395 million in the 1998 second quarter, before the 1998 worldwide restructuring program charge of $1,107 million. The increase reflects improved revenue growth, particularly in the United States and Europe, and ongoing benefits from the company's worldwide restructuring program and the continuing focus on productivity and expense controls.

Pre-currency revenues, excluding Brazil, grew 7 percent, reflecting revenue growth of 9 percent in the United States and 6 percent in Europe. Including Brazil where revenues declined substantially due to the January currency devaluation and economic weakness, pre-currency revenues grew 4 percent. Total 1999 second quarter revenues, including the effect of adverse European currency translation, grew 3 percent to $4.9 billion compared with $4.7 billion in the 1998 second quarter. Revenues in the 1999 first half were $9.2 billion compared with $9.0 billion a year ago.

Diluted earnings per share increased 15 percent to $0.62 in the 1999 second quarter from $0.54 in the 1998 second quarter, before the 1998 restructuring charge.

**77.** ~~79.~~ In describing the Company's geographical distribution of revenues, the Company's Second Quarter Form 10-Q stated:

> Other Areas include operations principally in Latin America, Canada, China, Russia, India, the Middle East and Africa. Revenue in Brazil declined by 32 percent in the 1999 second quarter and 38 percent in the 1999 first half reflecting primarily the very significant currency devaluation as well as the Brazilian recession. Brazilian revenues represented approximately 6 percent of Xerox revenues in the 1999 second quarter compared with 9 percent in the 1998 second quarter. Excluding Brazil, revenue growth in Other Areas was modest, including *strong growth in Mexico* and flat revenues in Canada. [Emphasis supplied].

**78.** ~~80.~~ On November 12, 1999, the Company filed its Form 10-Q for the quarter ended September 30, 1999 (the "Third Quarter 1999 Form 10-Q"). The Third Quarter 1999 Form 10-Q presented the following results:

> Pre-currency revenues, excluding Brazil, grew 6 percent, reflecting revenue growth of 6 percent in the United States, 3 percent in Europe, and 13 percent in the rest of the world. Including Brazil where revenues declined substantially due to the continuing effects of the January currency devaluation and the subsequent economic weakness, pre-currency revenues grew 2 percent. Including the effect of adverse European currency translation, total 1999 third quarter revenues of $4.6 billion were equal to the 1998 third quarter.

> Income declined 11 percent to $339 million in the 1999 third quarter from $381 million in the 1998 third quarter. The income decline reflects significant gross margin deterioration almost offset by lower selling, administrative and general expenses and lower research and development spending. The 1999 third quarter income decline also reflects deterioration in equity income, predominantly Fuji Xerox and increased non-financing interest expense. Operating income benefited from significantly lower provisions for overall incentive compensation expense.

> ...

> Diluted earnings per share declined 11 percent to $0.47 in the 1999 third quarter from $0.53 in the 1998 third quarter.

**79.** ~~81.~~ The Company's First through Third Quarter 1999 Forms 10-Q, which were incorporated by reference into the Form S-8 Registration Statements filed with the SEC pertaining to stock issued under the Plans, included material omissions with respect to the Company's financial results and prospects. These omissions included, without limitation, the fact that Xerox did not prepare its financial statements in accordance with GAAP, that Xerox did not maintain adequate internal controls or adequate internal structure, the Company improperly accounted for equipment sales and leasing revenues, in violation of SFAS 13, that the Company improperly accounted for its sales of receivables transactions and the other improprieties described herein, all of which resulted in the material overstatement of income and assets throughout the Class Period.

**80.** ~~82.~~ On February 23, 2000, the Company filed a Form 8-K with the SEC in which the Company announced that it was releasing its unaudited 1999 financial statements to the investment community and was posting them on its Internet web site in advance of the publication of its 1999 Annual Report to Shareholders. A copy of the financial statements was attached as an Exhibit to the Form 8-K. These financial statements, which also reiterated the materially false and misleading results previously published for years 1997 and 1998, reported the following for 1999: total revenues of $19.23 billion; net income of $1.42 billion; basic earnings per share of $2.09; and diluted earnings per share of $1.96.

**81.** ~~83.~~ On March 27, 2000, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 1999 (the "1999 Form 10-K"). This document was signed by Defendants Romeril, Thoman, Allaire, Buehler, Inman, Jordan, ~~Kobayashi,~~ Kopper, ~~Larsen,~~ Nicholas, ~~Pepper,~~ Russo, Seger, and Theobald, and reported the following results:

> Document Processing revenues of $19.2 billion in 1999 were flat on a pre-currency basis with 1998. Excluding Brazil, where revenues declined very substantially due to the currency devaluation and subsequent economic weakness, pre-currency revenues grew by 4

percent.  Revenues increased 8 percent on a pre-currency basis to $19.4 billion in 1998 and 7 percent on a pre-currency basis to $18.1 billion in 1997.

In the 1999 Form 10-K, net income was reported to be $1.424 billion and earnings per diluted share was reported to be $1.96.  The 1999 Form 10-K further noted:

> Excluding the 1998 restructuring charge, income from continuing operations decreased 16 percent in 1999 and increased 17 percent in 1998.

> Excluding the 1998 restructuring charge, diluted earnings per share from continuing operations decreased 16 percent in 1999 and increased 16 percent in 1998.

In describing the geographical distribution of its revenues during 1999, the 1999 Form 10-K stated:

> Revenues in the United States were 54 percent of total revenues in 1999 compared with 52 percent of revenues in 1998 and 51 percent in 1997.  European revenues represented 28 percent of total revenues in 1999, compared with 27 percent in 1998 and 1997.

> Other Areas, which includes operations in Latin America, Canada, China, Russia, India, the Middle East and Africa, contributed 18 percent of total revenues in 1999 compared with 21 percent in 1998 and 22 percent in 1997.

> ...

> Excluding Brazil, *revenue in Other Areas grew 8 percent in 1999, reflecting excellent growth in Mexico and Central America* and modest growth in Canada.  In 1998, revenues in Brazil declined 7 percent due to the difficult economic environment, and although our operations in Russia are relatively small, with revenue of less than $100 million, revenues declined very significantly due to the weak economy in that country.  *Growth in Canada and Mexico was strong in 1998; 1997 revenue growth reflects good growth in Brazil* and China, modest growth in Canada and *excellent growth in Mexico.*  [Emphasis supplied.]

**82.**   84. In the 1999 Form 10-K, the Defendants further emphasized the importance of revenues derived from operations outside the U. S., stating that Xerox "*derives approximately half its revenues from operations outside the United States*" [Emphasis supplied.]

**83.**   85. Under the heading "Revenue Recognition," the Company's 1999 Form 10- K stated:

> Revenues from the sale of equipment under installment contracts and from sales-type leases are recognized at the time of sale or at the inception of the lease, respectively.  Associated finance income is earned on an accrual basis under an effective annual yield method. Revenues from equipment under other leases are accounted for by the operating lease method and are recognized over the lease term. *Service revenues are derived primarily from maintenance contracts on our equipment sold to customers and are recognized over the term of the contracts.*  Sales of equipment subject to the Company's operating leases to third-party lease finance companies are recorded as sales at the time the equipment is accepted by the third party. [Emphasis supplied.]

**84.**   86. The Notes to the Company's financial statements stated the following under the heading, "Provisions for Losses on Uncollectible Receivables:" The provisions for losses on uncollectible trade and finance receivables are determined principally on the basis of past collection experience.

**85.**   87. The Company reiterated its description of its acquisition of The Rank Group Plc 20 percent interest in Xerox Limited as follows:

> In June 1997, we acquired the remaining 20 percent of Xerox Limited from The Rank Group Plc (Rank) in a transaction valued at (pound) 940 million, or approximately $1.5 billion.  As a result of this transaction, we now own 100 percent of Xerox Limited.  The transaction was funded entirely by debt consisting of (pound) 500 million of third-party debt and (pound) 440 million of notes payable issued to Rank, which were paid in deferred installments, half paid on June 29, 1998 and the other half paid on June 30, 1999.  The purchase price (including transaction costs) was allocated such that goodwill increased by $737, minority interest in equity of subsidiaries was reduced by approximately $720, with the balance

of $70 applied to other assets and liabilities, primarily investment in affiliates, at equity.

**86.** ~~88.~~ The statements identified from the 1999 Form 10-K were materially false and

misleading when made and/or omitted to disclose material facts due to the fact that, *inter alia*:

> The Company did not prepare its financial statements in accordance with GAAP;
>
> The Defendants knew or should have known that the Company's reported financial results were materially inflated by the improper accounting activities identified herein;
>
> The Company's purported growth in Mexico and Brazil was, in significant part, the product of the improper accounting;
>
> The Defendants knew or should have known that Xerox Mexico recorded revenues from inflated and/or fictitious invoices which resulted in uncollectible receivables for which inadequate reserves were established;
>
> The financial results improperly included a $100 million reserve which was improperly established in connection with the Company's acquisition of the 20% interest in Xerox Limited from The Rank Group Plc.

**E.    The Bad News Begins.**

**87.** ~~89.~~ On June 16, 2000, the Company started what would become a long string of

disclosures over the following two years.  Revealing only the tip of the iceberg, the June 16, 2000

Form 8-K cryptically revealed: "Registrant (or Xerox or the company) today announced that

second quarter underlying earnings per share would be below market expectations and likely in

line with the company's first quarter level.  Xerox said its earnings would be further reduced by

significant unexpected provisions in its Mexico business." Nonetheless, the Company's June 16,

2000 Form 8-K assured investors that the Company would soon report better results:

> "I am confident of improvements during the second half of the year, but they will be developing later and to a lesser degree than previously anticipated.  Momentum will accelerate as we enter 2001,"~~"~~ "~~ Allaire said.

> "It will take time to resolve our issues, but they are largely within our control and will be fixed.  We will continue to focus aggressively on our productivity initiatives and improving cash flow. Our technology, products and solutions are world-class.  Now our execution must--and will--improve," he added.

**88.** ~~90.~~ The Defendants' June 16, 2000 statements regarding the "unexpected" discovery of bad debts in Mexico were materially false and misleading because, as the Defendants knew or should have known, the Company's Mexican subsidiary had problems with receivables throughout the Class Period and, therefore, the discovery of the bad debts was not "unexpected." Moreover, the problems with the Company's Mexican subsidiary were far more extensive than the collectibility problem described by the Defendants.

**89.** ~~91.~~ The June 16 warning prompted Wall Street analysts to voice concern over credibility problems at Xerox.  For example, in response to Xerox's earnings warning, Salomon Smith Barney reduced its rating of the Company from a "buy" to "outperform."

**90.** ~~92.~~ On July 28, 2000, Standard & Poor's lowered its credit ratings for Xerox and reported that it remained on its CreditWatch "with negative implications." Xerox's senior debt was lowered from single-A to single-A-minus and its subordinated debt was reduced from single-A-minus to triple-B-plus.

**91.** ~~93.~~ On August 14, 2000, the Company filed its Form 10-Q for the quarter ended June 30, 2000 (the "Second Quarter 2000 Form 10-Q").  The Second Quarter 2000 Form 10-Q, signed by Defendant Tayler, stated the following regarding Xerox's "Mexico Provision:"

> During the second quarter of 2000, the Company recorded a pretax provision of $115 million ($78 million after taxes) related to its previously announced issues in Mexico.  The provision relates to establishing reserves for uncollectible long-term receivables, recording liabilities for amounts due to concessionaires and, to a lesser extent, for contracts that did not fully meet the requirements to be recorded as sales-type leases.  *The charge represents the Company's best estimate of the impact of currently known events.* Management, with the assistance of outside advisors, continues to

investigate our Mexican operations. Until the investigation is complete, the need, if any, for further provisions will not be known. Accordingly, it is not practical to estimate at this time, what, if any, additional provisions may be needed.

In response to these issues, the Company has taken the following actions - a number of senior local managers in Mexico were held accountable and removed from the Company; a new general manager was appointed in Mexico with a strong financial background; the Audit Committee of the Board of Directors has launched an independent investigation into the Mexican operation and an extensive review of the Company's worldwide internal controls was initiated to ensure that the issues identified in Mexico are not present elsewhere.

The Company was recently advised that the Securities and Exchange Commission (SEC) had entered an order of a formal, non-public investigation into our accounting and financial reporting practices in Mexico. The SEC has also issued subpoenas for the production of certain documents. We are cooperating fully with the SEC. [Emphasis supplied.]

**92.** ~~94.~~ The Second Quarter 2000 Form 10-Q reported the following results:

Total second quarter 2000 revenues declined 4 percent to $4.7 billion compared with $4 **94.9** billion in the 1999 second quarter....Excluding adverse currency translation, pre-currency revenues declined 1 percent. Excluding the beneficial impact of the January 1, 2000 acquisition of the Tektronix, Inc. Color Printing and Imaging Division (CPID), pre-currency revenues declined 4 percent.

Total revenues in the first half of 2000 of $9.1 billion declined 1 percent compared with $9.2 billion in the first half of 1999....Excluding adverse currency translation, pre-currency revenues increased 2 percent. Excluding the beneficial impact of the CPID acquisition, pre-currency revenues declined 1 percent. First quarter

2000 revenues included an increase of approximately $40 million associated with excellent growth in licensing patents from our intellectual property portfolio and selling standalone software.

Including a $115 million pre-tax provision ($78 million after taxes) related to the company's previously announced issues in Mexico, income in the 2000 second quarter was $145 million. Over a period of years, several senior managers in Mexico had collaborated to

circumvent Xerox accounting policies and administrative procedures, resulting in a charge primarily for uncollectible receivables and unrecorded liabilities. Excluding the Mexico provision, income declined 50 percent to $223 million from $448 million in the 1999 second quarter.

Additionally, the Second Quarter 2000 Form 10-Q stated:

Income before income taxes was $159 million in the 2000 second quarter including the Mexico provision. Excluding the Mexico provision, income before income taxes declined 57 percent to $274 million in the 2000 second quarter from $633 million in the 1999 second quarter.

**93.** ~~95.~~ On October 2, 2000, the Company also filed a Form 8-K stating that:

[i]t would likely report a third quarter loss of 15-20 cents per share. Revenue was much weaker than anticipated in North America and Europe, particularly in September. The expected improvement in high-end sales did not occur. Additionally, increased competitive pressures across all businesses and European currency deterioration are expected to have a further negative effect on gross margins. These factors are compounded by higher bad-debt provisions and increased investments required to resolve customer administration issues....The investigation related to accounting issues in Mexico is continuing and the company will provide an update at the time it reports third quarter earnings. The company will also address its plans to restore shareholder value in more detail when it announces third quarter earnings later this month.

**94.** ~~96.~~ On October 13, 2000, Fitch, an international rating agency, downgraded Xerox senior debt rating to BBB- from A- and the Company's U. S. commercial paper program to F3 from F2 due to the Company's decreasing financial performance, uncertainties surrounding the Company's business model and operating strategy moving forward, and the potential for reduced liquidity. Fitch's rating meant that the Company's debt stood at the threshold of speculative or "junk" grade. Fitch also placed the debt on Negative Watch for even further downgrade.

**95.** ~~97.~~ On November 3, 2000, the Company filed a Form 8-K to disclose its consolidated financial statements in advance of the filing of its Form 10-Q for the third quarter of 2000. The financial statements reflected *another* $55 million "Mexico provision," bringing the

total provision during the nine months ended September 30, 2000 to $170 million. The Company reported a net loss of $167 million, or $(0.26) per share. For the nine months, the company had been forced to increase its "provisions for doubtful accounts" by $316 million, compared to the $205 million increase in the nine months ended September 1999, even though revenues for the nine months ended September 2000 were $208 million less than those obtained in the nine months ended September 1999.

**96.**    98. On November 14, 2000, the Company filed its Form 10-Q for the quarter ended September 2000 (the "Third Quarter 2000 Form 10-Q"). Signed by Defendant Tayler, the Third Quarter 2000 Form 10-Q contained the same financial statements previously filed with the Company's November 3, 2000 Form 8-K.

**97.**    99. The Third Quarter 2000 Form 10-Q reported the Company's purported results:

> Income (Loss) before income taxes was a loss of $196 million in the 2000 third quarter including the Mexico provision. Excluding the Mexico provision, the loss before income taxes was $141 million in the 2000 third quarter compared with income of $505 million in the 1999 third quarter.

> Including the effect of special items, the loss before income taxes was $385 million in the first nine months of 2000. Excluding special items, income before income taxes in the first nine months of 2000 declined 73 percent of $435 million from $1,632 million in the first nine months of 1999. Special items include the following on a pre-tax basis – a charge of $623 million in connection with the 2000 restructuring program, a $27 million charge for acquired in-process research and development associated with the CPID acquisition and a $170 million provision for Mexico.

As to the "Mexico Provision," the Third Quarter 2000 Form 10-Q stated:

> For the nine months ended September 30, 2000, the Company recorded a pre-tax provision of $170 million ($120 million after taxes) related to its previously announced issues in Mexico. A portion of this provision includes an amount which would ordinarily represent a charge for uncollectable accounts that would be included in selling, administrative, and general expenses. This amount is presently not determinable.

The provision relates to establishing reserves for uncollectable long-term receivables, recording liabilities for amounts due to concessionaires and, to a lesser extent, for adjustments related to contracts that did not fully meet the requirements to be recorded as sales-type leases. No further provisions are expected. The investigation of this matter by the Audit Committee of our Board of Directors, with the assistance of outside advisors, is presently being finalized.

...

Including an additional $55 million pre-tax provision ($41 million after taxes) related to the company's previously announced issues in Mexico, the net loss was $167 million in the 2000 third quarter. No further provisions for this issue are expected. Excluding the Mexico provision, the third quarter 2000 net loss was $126 million compared with net income of $339 million in the 1999 third quarter.

...

Including the 6 cent provision arising from the *independent* investigation of our Mexico operations, our loss per share was $0.26 in the 2000 third quarter. Excluding this provision, the third quarter 2000 loss per share was $0.20 compared with $0.47 earnings per share in the 1999 third quarter. [Emphasis supplied.]

**98.**     ~~100.~~ The Company's Form 10-Q also stated:

Over a period of years, several senior managers in Mexico had collaborated to circumvent Xerox accounting policies and administrative procedures. The charges related to provisions for uncollectible long-term receivables, the recording of liabilities for amounts due to concessionaires and to a lesser extent for contracts that did not fully meet the requirements to be recorded as sales-type leases. No further provisions are expected. The investigation of this matter by the Audit Committee of our Board of Directors, with the assistance of outside advisors, is presently being finalized.

In response to these issues, the Company has taken the following actions – a number of senior local managers in Mexico were held accountable and removed from the Company, a new general manager was appointed in Mexico with a strong financial background.; the Audit Committee of the Board of Directors has launched an independent investigation into the Mexican operation and an extensive review of the Company's worldwide internal controls was initiated to ensure that the issues identified in Mexico are not present elsewhere.

  
**99.** ~~101.~~ The Company's First through Third Quarter 2000 Forms 10-Q, which were incorporated by reference into the Form S-8 Registration Statements filed with the SEC pertaining to stock issued under the Plans included material omissions with respect to the Company's financial results and prospects. These omissions included, without limitation, the fact that Xerox did not prepare its financial statements in accordance with GAAP, that Xerox did not maintain adequate internal controls or adequate internal structure, the Company improperly accounted for equipment sales and leasing revenues, in violation of SFAS 13, that the Company improperly accounted for its sales of receivables transactions and the other improprieties described herein. Moreover, the Company had, unbeknownst by investors, improperly recorded certain restructuring reserves associated with the Company's decisions to exit certain business activities. All of these actions resulted in the material overstatement of income and assets throughout the Class Period.

**100.** ~~102.~~ On December 1, 2000, Moody's Investor Services lowered its senior unsecured credit rating of Xerox and its subsidiaries to Ba1 form Baa2 and its short-term rating to Not Prime from Prime-2. This rating is below investment grade. Moody's rating outlook was "negative," citing concerns about liquidity and "earnings and operating cash flow deterioration." Shares of Xerox declined another 9.9%, to $6.25 per share. A spokesperson for T. Rowe Price Assoc., which held 8.1 million Xerox shares in June 2000, stated~~,~~ "[i]f you believe Xerox can't sell the assets, they have a problem; if you believe Xerox can't securitize finance receivables, they have a problem."

**101.** ~~103.~~ On April 3, 2001, the Company filed with the SEC a notification of late filing of its Form 10-K for the period ended December 31, 2000. According to the Company's press release, the delay related to an internal audit begun the previous week by the Company's Audit Committee, in cooperation with the company's auditors, KPMG. The company reassured

investors, however, that the Company's "accounting policies and procedures [were] appropriate and consistent with generally accepted accounting principles."

**102.** ~~104.~~ This was not the case. On May 31, 2001, the Company issued a press release announcing that it would restate $795 million in income and other results previously reported in its 1998, 1999 and 2000 financial statements, conceding that the statements were not prepared in accordance with GAAP.

**103.** ~~105.~~ On May 31, 2001, the Company also filed its restated financial statements for the years 1998 and 1999 with the SEC in a Form 8-K. The restatement was primarily comprised of:

(a)    $170 million ($120 million after taxes) pre-tax, for financial irregularities that occurred at Xerox's Mexican subsidiary, described by the Company as follows:

> The charges related to provisions for uncollectible long-term receivables, the recording of liabilities for amounts due to concessionaires and, to a lesser extent, for contracts that did not fully meet the requirements to be recorded as sales-type leases. The investigation of the accounting issues discovered in Mexico has been completed. The Company has restated its prior year Consolidated Financial Statements to reflect reductions to pre-tax income of $53 and $13 in 1999 and 1998, respectively. It is not practical to determine what portion, if any, of the approximate remaining $101 of the Mexican charge reflected in adjusted 2000 results of operations relates to prior years.

(b)    $100 million in reserves, which Xerox improperly used to "manage" its 1998 and 1999 earnings, described by the Company as follows:

> In connection with our acquisition of the remaining 20 percent of Xerox Limited from Rank Group, Plc in 1997, we recorded a liability of $100 for contingencies identified at the date of acquisition. During 1998, we determined that the liability was no longer required. During 1998 and 1999, we charged to the liability certain expenses incurred as part of the consolidation of our European back-office operations. This reversal should have been recorded as a reduction of Goodwill and Deferred tax assets. Therefore, we have restated our previously reported Consolidated

Financial Statements to reflect decreases of $67 to Goodwill and $33 of Deferred tax assets and increases in Selling, administrative and general expenses of $76 in 1999 and $24 in 1998;

and

(c)     $312 million during 1998 and 1999 attributable to improper

classification of residual values on certain leases, described as follows:

In addition to the above items, we have made adjustments in connection with certain misapplications of GAAP under SFAS No. 13, "Accounting for Leases." These adjustments primarily relate to the accounting for lease modifications and residual values as well as certain other items.

**104.**     ~~106.~~ On June 7, 2001, the Company filed its 2000 Form 10-K (the "2000 Form 10-K"), signed by Defendants Romeril, Allaire, Tayler, ~~Johnson,~~ Jordan, ~~Kobayashi,~~ Kopper, ~~Larsen,~~ Mitchell, Mulcahy, Nicholas, ~~Pepper,~~ Seger, and Theobald.  The Company reported $18,701 million in revenue, $384 million in losses before income taxes, and net losses of $257 million.  Basic and diluted earnings per share were reported to be negative $0.44.  The Company's fiscal 2000 results from the May 31, 2001 Form 8-K were repeated in the 2000 Form 10- K, as were the Company's representations concerning the restatement, quoted above.

**105.**     ~~107.~~ The 2000 Form 10-K included, in "Management's Discussion and Analysis of Results of Operations and Financial Condition," the following explanations of the Company's declining performance:

The business challenges that began to impact our performance in the second half of 1999 continued to adversely affect our financial performance in 2000.  We reported a net loss of $257 million or 44 cents per share in 2000 compared with a profit of $1,339 million or $1.85 per share in 1999.   These business challenges included company specific issues such as the realignment of our sales force from a geographic to an industry structure resulting in higher sales force turnover, open sales territories and lower sales productivity; the disruption and incremental costs associated with consolidation of our U.S.  customer administration centers and changes in our European infrastructure; competitive and industry changes; and

adverse economic conditions in our Latin American affiliates and in the U.S. toward the latter part of the year. These operational challenges, exacerbated by significant technology and acquisition investments, have resulted in credit rating downgrades, limited access to capital markets and marketplace concerns regarding our liquidity.

To counter these challenges, in October of 2000 we announced a turnaround program including anticipated asset sales totaling $2 - $4 billion, accelerated cost reductions and plans to transition the equipment financing business to third party vendors. At this time we believe our plan is on track as our prime objective of cash generation is being realized....In addition to our asset disposition initiatives, we are aggressively finalizing and implementing cost-reduction plans, which we anticipate will yield at least $1 billion in annualized savings by the end of 2001. Since the third quarter of 2000, we have taken actions that account for more than one-half of this target, including the reduction of approximately 2,000 and 4,300 jobs in the fourth quarter of 2000 and the first quarter of 2001, respectively.

The Company also reiterated its claims that:

In the normal course of business the Company generates revenue through the sale of equipment, services, and supplies and income associated with the financing of its equipment sales. Revenue is recognized when earned.

...

[and]

The provisions for losses on uncollectible trade and finance receivables are determined principally on the basis of past collection experience.

**106.** ~~108.~~ On July 12, 2001, the Company filed its Form 10-Q for the quarter ended March 31, 2001 (the "First Quarter 2001 Form 10-Q"). The First Quarter 2001 Form 10-Q, signed by Defendant Tayler, repeated the statements concerning the restatement and reported the following:

Total revenues declined 7 percent (5 percent pre-currency) in the 2001 first quarter from the 2000 first quarter significantly improving from the 16 percent (12 percent pre-currency) decline in

the 2000 fourth quarter (excluding the beneficial impact of the 2000 CPID acquisition). Excluding our China operations which we sold to Fuji Xerox in December 2000, first quarter 2001 pre-currency revenues declined 4 percent.

Beginning this quarter we have changed our revenue reporting to the following segments: Production, Office, Small Office/Home Office (SOHO) and we will continue to separately disclose revenues in Developing Markets Operations.

**107.** ~~109.~~ The First Quarter 2001 Form 10-Q also repeated the assurances, made quarterly since 1997, that the financial statements were prepared by the Company in compliance with GAAP and that, in the opinion of management, all necessary adjustments had been made.

**108.** ~~110.~~ On August 13, 2001, the Company filed its Form 10-Q for the quarter ended June 30, 2001 (the "Second Quarter 2001 Form 10-Q"). The Second Quarter 2001 Form 10-Q, signed by Defendant Tayler, reported the following results:

Total second quarter 2001 revenues of $4.1 billion declined 13 percent (12 percent pre-currency) from $4.8 billion in the 2000 second quarter. 2001 second quarter year over year pre-currency revenue declines of 4 percent in North America and 7 percent in Europe reflected in part, a weakened economic environment that impacted equipment sales. Developing Markets Operations second quarter 2001 revenues were 33 percent below the 2000 second quarter as we reconfigure our Latin American Operations to a new business approach prioritizing cash and profitable revenue.

Total revenues in the first half 2001 of $8.3 billion declined 11 percent (9 percent pre-currency) from $9.3 billion in the first half 2000. 2001 year to date pre-currency revenue declines of 1 percent in North America and 5 percent in Europe were the result of a weak economic environment partly offset by stabilization of the U.S. direct sales force.

Including a $196 million after-tax charge associated with the company's disengagement from the small office/home office (SOHO) business, an additional net after-tax restructuring provision of $35 million associated with the company's previously announced Turnaround Program and an $18 million after- tax gain on early retirement of debt, the second quarter 2001 net loss was $281 million. Excluding all these special items, the second quarter 2001 loss was $68 million including a loss of $56 million in our

worldwide SOHO operations from which we have recently announced our disengagement. Second quarter 2000 net income was $202 million. The 2001 second quarter loss reflected the revenue decline as well as a gross margin decline partially offset by lower selling, administrative and general expenses (SAG) reflecting the continuing benefits from our Turnaround Program.

The 2001 first half net loss was $79 million compared to a net loss of $47 million in the first half 2000. 2001 special items included the following after-tax charges - $196 million associated with the company's disengagement from the SOHO business, $96 million related to the company's previously announced Turnaround Program, and a $2 million loss from the implementation of SFAS 133. Special items also included the following after-tax gains - $300 million related to the March 2001 sale of half of our investment in Fuji Xerox Co., Ltd. (Fuji Xerox) to Fuji Photo Film Co. Ltd. (Fujifilm), and $35 million associated with the early retirement of debt. 2000 special items include a $423 million after-tax restructuring provision and a $19 million after- tax in-process research and development charge associated with the January 1, 2000 acquisition of the Tektronix, Inc. Color Printing and Imaging Division (CPID).

Excluding all special items, the first half 2001 net loss was $120 million compared with net income of $394 million in the 2000 first half. Including the $0.28 SOHO disengagement charge, $0.05 restructuring provision and the $0.03 gain from the early retirement of debt, our loss per share was $0.40 in the 2001 second quarter. Excluding these items the second quarter 2001 loss per share was $0.10 compared with $0.27 earnings per share in the 2000 second quarter.

Including the $0.28 SOHO disengagement charge, $0.14 restructuring provision, $0.43 gain on the sale of Fuji Xerox, and $0.05 gain from the early retirement of debt, the first half 2001 loss per share was $0.13. The first half 2000 loss per share was $0.10 including charges of $0.66 for restructuring and acquired CPID in-process R&D. Excluding all special items, the 2001 first half loss per share was $0.19 compared with $0.56 earnings per share in the 2000 first half.

**109.** ~~111.~~ On November 13, 2001, the Company filed its Form 10-Q for the quarter ended September 30, 2001 (the "Third Quarter 2001 Form 10-Q"). The Third Quarter 2001 Form

10-Q, signed by Defendant Kabureck, repeated the statements concerning the restatement and

reported the following results:

> Total third quarter 2001 revenues of $3.9 billion declined 13 percent (12 percent pre-currency) from $4.5 billion in the 2000 third quarter. This decline was driven by increased competitive pressure and continued weakness in the economy exacerbated by the events of September 11. While revenue in North America and Europe declined, both regions showed significant year-over-year profitability improvements led by North America. Developing Markets Operations third quarter 2001 revenues were 34 percent below the 2000 third quarter as we reconfigure our Latin American Operations to a new business approach prioritizing liquidity and profitable revenue rather than market share.

> Total revenues in the first nine months of 2001 of $12.2 billion declined 11 percent (10 percent pre-currency) from $13.8 billion in the first nine months of 2000. Year to date pre-currency revenue declines of 2 percent in North America and 5 percent in Europe were the result of a weak economic environment and competition partly offset by stabilization of the U.S. direct sales force.

> Including additional net after-tax restructuring provisions of $37 million associated with the company's previously announced Turnaround Program and disengagement from our worldwide small office / home office (SOHO) business and a $1 million after tax gain on early retirement of debt, the third quarter 2001 net loss was $211 million. Excluding these items, the third quarter 2001 after tax loss was $175 million. In the 2001 third quarter, we incurred a $37 million loss in our worldwide SOHO operations. The 2001 third quarter loss reflected the revenue decline, but our operating margin stabilized together with an improvement in the gross margin.

> The 2001 year to date net loss was $289 million compared to a net loss of $237 million in the first nine months 2000. 2001 special items included the following after-tax charges - $190 million associated with the Company's disengagement from the SOHO business, $139 million related to the Company's previously announced Turnaround Program, and a $2 million loss from the implementation of SFAS 133. Special items also included the following after- tax gains - $300 million related to the March 2001 sale of half of our investment in Fuji Xerox Co., Ltd. (Fuji Xerox) to Fuji Photo Film Co. Ltd. (Fujifilm), and $36 million associated with the early retirement of debt. 2000 special items include a $423 million after tax restructuring provision and a $16 million after- tax in-process research and development charge associated with the

January 1, 2000 acquisition of the Tektronix, Inc. Color Printing and Imaging Division (CPID).

Excluding all special items, the year to date 2001 net loss was $294 million compared with net income of $202 million in the first nine months of 2000.

Our loss per share was $0.29 in the 2001 third quarter.  Excluding the $0.05 restructuring provision, the third quarter 2001 loss per share was $0.24 compared with $0.30 loss per share in the 2000 third quarter.

**110.**    ~~112.~~ Then, on April 1, 2002, the Company shocked investors, including employees and participants in the Plans, by disclosing the existence of additional material accounting improprieties.  In a press release, Xerox announced that it had reached agreement with the SEC to settle allegations on matters that had been under investigation since June 2000.  Pursuant to the agreement, Xerox agreed to pay a record $10 million fine and restate its 1997-2001 earnings.  According to the Company:

The agreement in principle calls for a restatement of Xerox's financials for the years 1997 through 2000 as well as an adjustment of previously announced 2001 results.  The restatement will primarily reflect adjustments in the timing and allocation of lease revenue recognition and could involve a reallocation of equipment sales revenue in excess of $2 billion from 1997 through 2000.  Those revenues will be reallocated among equipment, service and finance revenue streams as appropriate applying a methodology different than the one the company had used during those years.  The resulting timing and allocation adjustments cannot be estimated until the restatement process has been completed.  In any event, there will be no impact on the cash that has been received or is contractually due to be received from these leases.  Furthermore, the monetary value of the leases does not change.  The restatement will also include adjustments that could be in excess of $300 million due to the establishment and release of certain reserves prior to 2001 and other miscellaneous items.

...In addition to the restatement, the agreement in principle calls for the SEC to file a complaint and a consent order in federal district court for injunctive relief and a civil penalty of $10 million.  Xerox would neither admit nor deny the allegations of the complaint,

which would include claims of civil violations of the antifraud, reporting and other provisions of the securities laws.

The company sells most of its products and services under bundled contracts that contain multiple deliverable elements. The contracts typically include equipment, service, supplies, and financing components for which the customer pays a single monthly-negotiated price as well as a variable service component for page volumes in excess of stated minimums. The SEC claims that Xerox's revenue-allocation methodology for these contracts did not comply with the Statement of Financial Accounting Standards No. 13.

**111.** ~~113.~~ On June 28, 2002, over twenty four months after the initial announcement in June 2000, Xerox announced completion of the restatement and the belated filing of its 2001 Form 10-K. According to Xerox, the 10-K:

includes a restatement for the years 1997 through 2000 as well as adjustments to previously announced 2001 results. The restatement, required under the company's previously announced settlement agreement with the Securities and Exchange Commission, primarily reflects changes to the company's lease accounting under Statement of Financial Accounting Standards No. 13. As a result, adjustments have been made to the timing and allocation of equipment, service, rental and finance revenue streams. *Approximately $1.9 billion of revenue that was recognized over past years has been reversed and will be recognized in the company's future results, beginning in* ~~2002...~~ ***2002….***

...

The reversal of equipment sale revenue was larger than initially expected primarily due to a change in the company's lease accounting in Latin America from equipment sales to rental.

In addition to the reallocation of revenues, the restatement includes a $368 million reduction in pre-tax income primarily due to the timing of the establishment and release of certain reserves, including restructuring reserves and the timing of recognition of interest income on tax refunds.

In total, pre-tax income over this five-year period declined by $1.4 billion from previously reported amounts. Shareholders equity was reduced by $1.3 billion as of year-end 2001. [Emphasis supplied.]

**112.** ~~114.~~ The 2001 Form 10-K was filed by the Company on June 28, 2002, and reflected the restatements as identified above.

**113.** ~~115.~~ The 2001 Form 10-K was signed by Defendants Mulcahy, Zimmerman, Kabureck, ~~Johnson,~~ Jordan, ~~Kobayashi,~~ Kopper, ~~Larsen,~~ Mitchell, Nicholas, ~~Pepper,~~ Seger, and Theobald.

**114.** ~~116.~~ The restatement was detailed in the Company's 2001 Form 10-K, belatedly filed with the SEC on June 28, 2002. After accounting for the restatement, the Company reported $17.008 billion in revenue and a net loss of $71 million. Diluted losses per share were reported to be $0.12. In addressing the restatement, the Company revealed:

> We have determined that certain of our accounting practices misapplied U. S. generally accepted accounting principles (GAAP). Accordingly, we have restated our financial statements for the four years ended December 31, 2000 and revised our previously announced 2001 results included in our earnings release dated January 28, 2002....We reversed cumulative net revenue of $1.9 billion that was recognized in prior years, of which $1.3 billion is reflected in the years 1997 to 2001. This revenue adjustment is comprised of a reduction in equipment sales revenue, previously recognized from 1997 through 2001, of $6.4 billion offset by $5.1 billion of service, rental, document outsourcing and financing revenue now recognized from 1997 through 2001. The remaining net amount of revenue reversed, of $600 million, represents the cumulative net revenue impacts of reversing equipment sales transactions that were previously recorded in periods prior to 1997. Based on the cumulative impacts of the revenue adjustments for all periods prior to December 31, 2001, including pre-1997 impacts, we anticipate the recognition of $1.9 billion in revenues over the next several years through 2006. This represents sales-type lease revenue that had previously been recorded, that is expected to be earned over time as a component of our rental, service and finance revenue. In addition to the aforementioned revenue timing adjustments, and as more fully discussed below, we permanently reduced reported revenue by $269 million, for the five-year period ended December 31, 2001, as a result of the deconsolidation of our South African affiliate. Revenues from 1997 through 2001 as originally reported were $92.6 billion compared to $91.0 billion after the restatement....As of December 31, 2001 our restated

Common Shareholders'_ Equity is $1.8 billion versus $3.1 billion as originally included in our January 28, 2002 earnings release.

...

The restatement reflects adjustments which are corrections of errors made in the application of GAAP and includes (i) adjustments related to the application of the provisions of Statement of Financial Accounting Standards No. 13 "Accounting for Leases" (SFAS No. 13) and (ii) adjustments that arose as a result of other errors in the application of GAAP....

The "other errors in the application of GAAP"_" included:

Improper accounting for sales of receivables transactions;

Inappropriate accounting applied to consolidation of Xerox's South African affiliate;

Improper accounting for purchase accounting reserves in connection with the Company's 1998 acquisition of XL Connect Solutions, Inc.;

Improper recording of certain restructuring reserves during 2000 and 1998 associated with the Company's decisions to exit certain business activities;

Improper accounting relating to tax refunds; and

Other accounting errors with respect to the accounting for certain non-recurring transactions, the timing of recording and reversing certain liabilities and the timing of recording certain asset write-offs.

**115.** ~~117.~~ On July 1, 2002, the Company filed its Form 10-Q for the quarter ended March 31, 2002 (the "First Quarter 2002 Form 10-Q"). The First Quarter 2002 Form 10- Q, signed by Defendant Kabureck, reported the following disappointing results:

2002 Revenues of $3.9 billion declined 10 percent from $4.3 billion in the first quarter of 2001, reflecting continued economic weakness and marketplace competition....

The first quarter 2002 net loss of $46 million or $0.06 cents per share, included after tax restructuring charges of $101 million ($146 million pre-tax), an after tax charge of $44 for permanently impaired capitalized software ($72 million pre-tax), and a $10

million civil penalty associated with our settlement with the SEC net after tax losses from unhedged foreign currency exposures of $22 million. These were offset by an after-tax gain of $12 million ($19 million pre-tax) related to proceeds received from sale of stock of an insurance company in a demutualization. 2001 first quarter net income of $222 million or $0.28 cents per share included the following net after-tax items: a $304 million gain ($769 million pre-tax) on the sale of half our interest in Fuji Xerox, after tax restructuring charges of $81 million ($129 million pre-tax**pretax**), unhedged foreign currency gains of $44 million ($64 million pre-tax) an after tax $17 million extraordinary gain ($28 million pre-tax) reflecting the early retirement of debt. See Note 2 to the Condensed Consolidated Financial Statements for further discussion.

**116.** 118. On August 9, 2002, the Company filed its Form 10-Q for the quarter ended June 30, 2002 (the "Second Quarter 2002 Form 10-Q"). According to the Second Quarter 2002 Form 10-Q, signed Defendant Kabureck, revenues and other key performance indicators continued to decline:

Total second quarter 2002 revenues of $4.0 billion declined 8 percent from $4.3 billion in the second quarter of 2001 reflecting continued economic weakness and marketplace competition....

Total revenues of $7.8 billion declined 9 percent from $8.6 billion in the first half of 2002....

Second quarter 2002 net income of $93 million, or $0.12 cents per diluted share, included after-tax restructuring charges of $41 million ($53 million pre-tax), and net after-tax losses from unhedged foreign currency exposures of $24 million ($33 million pre-tax). The second quarter 2001 net loss of $101 million, or $0.14 cents per share, included after-tax restructuring charges of $222 million ($295 million pre-tax), net after-tax losses from unhedged foreign currency exposures of $10 million ($13 million pre-tax), after-tax goodwill amortization of $15 million ($16 million pre-tax) and an after-tax gain of $18 million ($30 million pre-tax) reflecting the early extinguishment of debt....

**117.** 119. The consequences of Xerox's misconduct included, but were not limited to the following:

(a)     An SEC enforcement complaint filed in the United States District Court for the Southern District of New York and a record $10 million penalty paid to the SEC.

(b)     A restatement by Xerox of five years of financial statements (1997-2001), shifting $6.4 billion in revenues.

(c)     "Wells notices" to top Xerox executives indicating forthcoming additional enforcement proceedings.

(d)     The dismissal of Xerox's long-time auditor, KPMG, in September of 2001.

(e)     Delayed filing of Xerox's 2001 10-K.

(f)     Creation of a new special committee of the Board of Directors to review Xerox's accounting controls and policies.

**118.**     120. As fiduciaries for the Plan and UNITE Plan, Defendants should have provided participants and beneficiaries and each other and other fiduciaries with accurate and complete information regarding Xerox stock, such that they could have appreciated the true risk presented by investment in the stock, could have made informed decisions regarding their retirement benefits as opposed to decisions based on incomplete, inaccurate, and misleading information.

**119.**     121. As fiduciaries for the Plan and UNITE Plan, Defendants had a duty to monitor the prudence of investment in Xerox stock (including the continuing offering of the Xerox Stock Fund as a Plan and UNITE Plan investment alternative).  Had Defendants faithfully discharged this duty, they would have recognized, no later than the beginning of the Class Period, that such investment and continued offering were not prudent and would have, *inter alia*, (i) moved expeditiously to disinvest the Plan and the UNITE Plan from Xerox stock; (ii) eliminated the Xerox Stock Fund as a Plan and UNITE Plan investment alternative; and/or (iii) informed the

relevant persons of the true state of affairs and taken other ameliorative measures. Defendants'
failure to do so caused the Plan and the UNITE Plan to suffer tens of millions of dollars in losses or
damages as a result of the continuing decline in value of Xerox stock after the time that the
investment in Xerox stock and offering of the Xerox Stock Fund as an investment alternative had
become imprudent.

**120.**  ~~122.~~ Because Defendants knew or should have known about the Company's
irregular and potentially unlawful accounting practices, and the consequent artificial inflation of
Xerox stock, Defendants should have acted to ensure that the Plan and UNITE Plan were protected
against loss incurred as a result of investment in Xerox stock.

**121.**  ~~123.~~ To the extent Defendants purchased or directed the purchase of Xerox stock
on behalf of the Plan or UNITE Plan, or contributed Xerox stock to the Plan or UNITE Plan,
Defendants knew or should have known that such investments were imprudent and harmful to
participants and beneficiaries. Therefore, as fiduciaries for the Plan or UNITE Plan, Defendants
had a duty to refrain from such activity.

**122.**  ~~124.~~ Upon information and belief, Defendants continued to invest or allow
investment of Plan assets in Xerox stock even after the company's irregular and potentially
unlawful accounting practices were made public, and, thus, at such time that no reasonable
fiduciary possibly could have concluded that investment of Plan assets in Xerox stock was
prudent.

**F.    Communications with Plan Participants Concerning Purchases of Xerox Stock, One
of the Assets in the Plans.**

**123.**  ~~125.~~ Xerox and a number of the Defendants regularly communicated with
employees, including participants in the Plans, about Xerox's financial performance, future
financial and business prospects, and Xerox stock, one of the assets in the Plans. These

communications occurred in a variety of forms, as described below.  Throughout the Class Period, the Company fostered a positive attitude toward the corporation as an investment.  Management touted strong Company performance and stock benefits.  Employees continually heard positive news about the Company's growth and were led to believe that Xerox stock was a good investment.

**124.**  ~~126.~~ Employees, including Plan participants, were regularly encouraged to invest, and told that management, too, were also investing in Xerox stock.

**125.**  ~~127.~~ Every year, the Company's senior management hosted "Kickoff meetings," attended by Xerox executives, high profile guest speakers, and hundreds of Xerox employees and Plan participants.  At these meetings, speakers hammered on the strength of Xerox and its stock, and painted a glowing picture of strong performance and financial strength.  Included in the presentations were live or videotaped interviews with the Xerox CEO and other executives, including Defendants Allaire and Thoman, touting the Company and its stock, which were also circulated internally throughout the Company to employees.

**126.**  ~~128.~~ The Company, through the Trust Investments department of the Xerox Treasury organization, issued a quarterly newsletter to Plan participants, entitled *Investing for your Future*.  The stated purpose of the newsletter was to "keep Xerox U.S. employees informed about the investment of their Profit Sharing and Savings Plans," and it provided quarterly investment results on Plan options, including the Xerox Stock Fund, investment advice, information on Plan policies and benefit calculations, along with an explanation of how to obtain more information and make changes to investment options online or by phone.  The Xerox Stock Fund information generally showed very positive results.

**127.** ~~129.~~ Xerox also promoted its performance and stock to employees, including participants of the Plans, over its web site, by means of a daily publication entitled "*Today at Xerox*" ("TAX"). Through TAX, the Company provided employees with daily Company news, press releases, including quarterly earnings releases, financial reports, monthly reports on performance of the profit sharing and savings funds for the Plans, product, market share and staffing information, and copies of favorable articles about the ~~Company~~**company** appearing in other publications (e.g., *Forbes, Industry Week*). Xerox senior management regularly communicated to employees via TAX.

**128.** ~~130.~~ Information was also provided to employees on the Company's internal "WebBoard" at http://www.internal.xerox.com. The entire text of CEO interviews, as well as question and answer sessions, were posted on the WebBoard, long after the interview occurred. Often postings, including "Management Communique," quoted or were signed by Defendants Allaire, Mulcahy and/or Thoman. The Company also posted positive news articles on bulletin boards in the hallways at the Company's offices.

**129.** ~~131.~~ "Xen Broadcast," an interactive forum, has been accessible to employees since approximately 1990. Employees, via telephone or internet, are permitted to listen to discussions about the Company and its performance, and to ask questions – enabling them to learn what the Company as a whole is doing. These broadcasts discussed Xerox stock, upcoming products, and the Company's increasing value. For instance, on January 28, 2000, Defendants Thoman and Mulcahy participated with other Xerox employees in a live broadcast presentation from the Riverside Convention Center in Rochester. According to the presentation transcript, three thousand "Xerox people" were in attendance, with thousands more listening and participating via satellite from Europe and throughout North America.

**130.** ~~132.~~ On December 7, 1999, during another "Town Hall Meeting"/XEN Broadcast, Defendant Thoman emphasized that "Double digit revenue growth is a realistic goal for 2000." "**Thoman continued: "Another value we need to add is accountability for performance... All of us need to stand and deliver...to take ownership...to take personal responsibility to do whatever it takes to get the job done."

**131.** ~~133.~~ These postings were littered with quotes from Defendants Allaire, Mulcahy, and Thoman. Again, on September 9, 2002, in a XEN Broadcast, Defendant Mulcahy reiterated that "Xerox is getting stronger and better everyday."

**132.** ~~134.~~ "Message from the CEO" **"** is another avenue the Company used to boost morale whereby Xerox's CEO sends lengthy, detailed voicemail broadcasts to all employees, providing information about Company and stock performance, product roll-outs, financial and earnings statements, and actions that will be taken in the near future. These voicemails were regularly sent to employees, directly into their personal ~~voicemail~~**voice-mail** boxes. Many such messages were issued during the Class Period by Defendants Allaire, Mulcahy and Thoman, at least several of which incorrectly assured employees that the negative market commentary did not accurately reflect the Company's true strength.

**133.** ~~135.~~ Company leaders uniformly portrayed the positive performance of Xerox and its stock. Xerox leaders, including Defendants, sold employees on the health and future of the Company, throughout the Class Period and most noticeably during Xerox's rapid, dramatic growth in 1998-1999.

**134.** ~~136.~~ Management continuously stressed that the Xerox Stock Plan was a good retirement investment under the Plans. For example, Defendants Allaire and Romeril frequently

made comments around the work place, such as: "that stock fund looks pretty good," "invest in the Company," and often asked if their support staff were investing in Company stock.

**135.** ~~137.~~ On October 21, 1999, during a "Company CEO Report" for November 1999, issued to employees over *Today at Xerox*, Defendant Thoman stated: "...I held the Xerox stock, I believe in the Xerox stock. I'm going to buy Xerox stock as soon as I can at this price, because I think it's a good thing to do. And I think *if you believe in the company, you want to buy the stock* and that certainly....there's nothing I've done before our problems that would...just before our problems, that would indicate anything different than that." And "I put every bit of my bonus that I possibly could into that first window because I thought at $47, the stock was a very good buy. I still think at $47 dollars the stock's a very good buy. So those of you who waited, good luck. These are about the cheapest options you'll ever see." (Emphasis supplied)

**136.** ~~138.~~ Investment in Xerox was a mantra at regularly held meetings. At Xerox business meetings, including President Club, Regional, and local office meetings, Xerox executives (e.g. regional Vice Presidents), told of the great future of the Company and its stock. The President Club activities and Regional meetings were held at least once a year. Local office meetings were held approximately twice a month. During various presentations and regional and local meetings, including regional meetings in 1998 and 1999, both regional and local Vice Presidents discussed the positive outlook for the future and the growth that was occurring in Xerox stock. Stories of the Xerox investors' success were used in speeches to motivate sales employees. Many employees were enthusiastic about the Company, and upon the information and encouragement of senior management, increased their investment in Xerox stock. Many employees continued to purchase stock as the price declined, because they were assured, through Company communications, that the Company was still sound and that the stock price would

rebound.  They were assured that the stock value would never fall below its purchase price, and that they would be rich if they invested enough.

**137.**  ~~139.~~ For example, on January 27, 2000, in a *Today at Xerox* article entitled *New Stock Options to be Granted, Changes to Tuition Aid*, the Company told employees that "Xerox people will each receive 100 stock options on February 7.  Said Thoman: 'The low price of Xerox stock makes stock options very attractive now.'…  'If we do it right,' said Thoman, 'these options will be in the money when 50 of them vest next January.'"

**138.**  ~~140.~~ Employees never received any information from the Company or any Plan fiduciary that led them to believe that the company's stock was not a good investment for retirement funds.

**139.**  ~~141.~~ Defendants breached their fiduciary duties of loyalty and prudence in these communications with employees by failing to disclose complete and accurate information about Xerox stock, one of the investment options in the Plans.

**140.**  ~~142.~~ Promotional statements were made by Defendants and other Xerox officers and/or directors for the purpose of encouraging participants in the Plans to invest in Xerox stock, and discouraging participants in the Plans from liquidating the amounts they already had invested in Xerox stock.  Upon information and belief, Defendants made such statements for several reasons, including the fact that shares owned indirectly by the Plans, through the Plans' investments in the Xerox stock funds available under the Plans, consisted of a large block of stock that was likely to be voted in accordance with the wishes of Xerox's management.  Additionally, participants' purchase of Xerox stock through the Plans created extra demand for Xerox stock and thus helped increase the market price for Xerox stock, which was another objective of the Defendants.

**141.** ~~143.~~ These representations were made in the context of a company that had told its employees that, contrary to the public's understanding of the Company, Xerox's performance was much stronger than what was being portrayed in the market; that the Company was expecting double digit growth; that other employees, and specifically management, were continuing to invest in Xerox stock; and that the Company overall was healthy.

**142.** ~~144.~~ The Defendants' conduct as aforesaid influenced and raised the price at which Class members purchased Xerox stock through the Plans.

**143.** ~~145.~~ As of result of the various breaches of duties described herein, Xerox employees lost large portions of their retirement accounts and much of their life savings.

## VI.    COUNTS

### COUNT I

### IMPRUDENT INVESTMENT OF PLANS' ASSETS

**(Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C.**

**§ 1104(a)(1)(A)-(D), 29 U.S.C. § 1105, 29 U.S.C. §1109(a))**

**(Against Defendants Xerox, Allaire, Becker, Buehler, Clayton, Conkright, Davis, Drucker, Filter, Inman, Jordan, Kabureck, Kaster, Kopper, Mitchell, Mulcahy, Nazemetz, Nicholas, Roscoe, Romeril, Russell, Russo, Seger, Strusz, Tayler, Theobald, Thoman and Zimmerman, _i.e._, the Company and the Administrator, Treasurer, JAB, Fiduciary Investment Review Committee, Finance Committee and Director Defendants)**

**144.** ~~146.~~ Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Amended Complaint as if fully set forth herein.

**145.** ~~147.~~ At all relevant times, Defendants were and acted as fiduciaries for their respective Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**146.** ~~148.~~ At all relevant times, each Defendant also was and acted as a co-fiduciary of the other Defendants and the other Plan and UNITE Plan fiduciaries, as applicable, within the meaning of ERISA § 405, 29 U.S.C. § 1105.

**147.** ~~149.~~ Under ERISA, Defendants were responsible for the prudence of the Plans' investments. ERISA § 404(1), 29 U.S.C. §1104(1). This included the responsibility for evaluating, on an ongoing basis, the prudence of continuing to offer the Xerox Stock Fund as an investment alternative.

**148.** ~~150.~~ Plan participants and beneficiaries did not exercise control over their investments in this case because Defendants failed to provide them with complete and accurate information regarding Xerox stock, and misled them regarding the appropriateness of Xerox stock as a Plan asset. Therefore, Defendants were liable for losses that were incurred as a result of imprudent investments.

**149.** ~~151.~~ During the Class Period, none of the Defendants reasonably could have determined that Xerox stock was a suitable and appropriate investment for the Plans. Defendants were obligated to monitor and evaluate, among other things, information concerning the Company's performance and prospects, including information made public by the Company and by analysts and rating agencies. Had Defendants done so, they would have taken appropriate action, including one or more of the following: (i) eliminating the Xerox Stock Fund as an investment option under the Plans; (ii) adopting an appropriate divestment policy with respect to Xerox stock in the Plans; (iii) appointing an independent fiduciary to evaluate whether the Xerox Stock Fund should remain an investment option under the Plans and/or determine an appropriate strategy for divestment; (iv) adopting a policy for limiting the amount of Xerox stock that could be held in the Plans; and/or (v) notifying the Secretary of Labor of the situation. However,

Defendants failed to discharge their fiduciary obligations and instead continued to manage, direct and approve investment of assets of the Plans in Xerox stock and maintained the Xerox Stock Fund as an investment alternative.  Thus, Defendants breached their fiduciary duties by failing to prudently invest the Plans' assets.

**150.**  ~~152.~~ Xerox knowingly participated in its own and the other Plan and UNITE Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**151.**  ~~153.~~ If the Defendants had at all times discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars.

**COUNT II**

~~**PURCHASING COMPANY STOCK AT ABOVE FAIR MARKET VALUE**~~

~~**(violations of ERISA Sections 406(a)(1)(E) and 407(a), 29 U.S.C.**~~
~~**§§ 1106(a)(1)(E) and 1107(a))**~~

~~154.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Amended Complaint as if set forth fully herein.~~

~~155.    Defendants, in connection with their actions and omissions in authorizing or causing the Plan to continue to offer Xerox stock as an investment option, permitted Plan participants to invest in Xerox stock at a time when they knew or should have known that Xerox revenues were materially inflated and that, as a result, the price per share at which the Plan was acquiring Xerox stock exceeded fair market value and was more than adequate consideration for such shares.  Thus, Defendants caused the Plan to engage in transactions that Defendants knew or~~

~~should have known constituted a direct or indirect acquisition of Xerox stock in violation of~~

~~ERISA Sections 406(a)(1)(E) and 407(a), 29 U.S.C. §§ 1106(a)(1)(E) and 1107(a).~~

~~156.    Because the price at which Defendants caused the Plan to accept and/or acquire Xerox stock exceeded fair market value and was more than adequate consideration, the prohibited transactions are not exempt under the provisions of ERISA Section 408(e)(1), 29 U.S.C. § 1108(e)(1).~~

~~157.    If the Defendants had not allowed the Plan to accept and/or acquire Xerox stock at prices that exceeded fair market value, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the violations of ERISA Sections 406(a)(1)(E) and 407(a), 29 U.S.C. §§ 1106(a)(1)(E) and 1107(a), the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars.~~

## COUNT ~~III~~

## FAILURE TO MONITOR THE PLANS' FIDUCIARIES

**(Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C.**

**§ 1104(a)(1)(A)-(D), 29 U.S.C. § 1105, 29 U.S.C. § 1109(a))**

**(Against Defendants Xerox, Allaire, Becker, Buehler, Inman, Jordan, Kopper, Mitchell, Mulcahy, Nicholas, Romeril, Russo, Seger, Theobald, and Thoman, _i.e._, the Company and the Finance Committee and Director Defendants)**

**152.** ~~158.~~ Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Amended Complaint as if set forth fully herein.

**153.** ~~159.~~ At all relevant times, Defendants were and acted as fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans to the extent that they were charged with, responsible for, and/or otherwise assumed, the duty of selecting, monitoring, and, when and if necessary, removing other fiduciaries, including but not limited to

those persons specifically identified as fiduciaries in plan documents, including Treasurers, Members of the Plan's Finance Committee, Members of the Fiduciary Investment Review Committee, Xerox members of the UNITE Plan Joint Administrative Board and investment managers, if any, appointed by the fiduciaries.

**154.** ~~160.~~ A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the plan, including employer securities, to ensure that each investment is suitable. Thus, in connection with its duty to monitor the Plans' other fiduciaries, Defendants were responsible for monitoring the manner in which those fiduciaries were investing the respective Plans' assets within the fund options, as well as the investment of profit sharing contributions.

**155.** ~~161.~~ As fiduciaries with knowledge that Plan and UNITE Plan assets were being invested in Xerox stock by investing fiduciaries, Defendants also had an affirmative duty to disclose to the investing fiduciaries such material facts about the financial condition of the Company that these Defendants knew or should have known the investing fiduciaries needed in order to make sufficiently-informed decisions, based on accurate information, concerning those investments.

**156.** ~~162.~~ At all relevant times, each Defendant in this Count also was, and acted as, a co-fiduciary of the other Defendants and the other Plan and UNITE Plan fiduciaries, respectively, within the meaning of ERISA § 405, 29 U.S.C. § 1105.

**157.** ~~163.~~ Defendants breached the fiduciary and co-fiduciary duties they owed to Plaintiffs, and the other Plan and UNITE Plan participants and beneficiaries by:

> (a)     failing to adequately monitor the investing fiduciaries' investment of the Plans' assets;

(b)     failing to adequately monitor the Plans' other fiduciaries' implementation of the terms of the Plans, including but not limited to the investment of the Plans' assets;

(c)     failing to disclose to the investing fiduciaries material facts concerning the financial condition of Xerox that they knew or should have known were material to loyal and prudent investment decisions concerning the use of Xerox stock in the Plan or UNITE Plan and/or with respect to the implementation of the terms of the Plan or UNITE Plan;

(d)     failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plans' assets;

(e)     failing to conduct an independent investigation into and continually to monitor the merits of investing the Plans' assets in Xerox stock;

(f)     knowingly participating in the investing fiduciaries' breaches by knowingly accepting the benefits of those breaches, both personally and on behalf of the Company; and

(g)     failing to remedy those fiduciaries' breaches, having knowledge of them.

**158.**     ~~164.~~ Xerox participated in its own and the other Plan and UNITE Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**159.**     ~~165.~~ If the Defendants had at all times discharged their fiduciary duties to monitor the Plans' fiduciaries, including by discharging those engaged in breaches of fiduciaries duties and those with conflicts of interest (and replacing the discharged fiduciaries with qualified fiduciaries), the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and

proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and

indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars.

## COUNT IV~~III~~

## PROVIDING INCOMPLETE AND INACCURATE

## INFORMATION TO PARTICIPANTS

**(Breaches of fiduciary and co-fiduciary duties in violation of ERISA, 29 U.S.C.**

**§ 1104(a)(1)(A)-(D), 29 U.S.C. § 1105, 29 U.S.C. §1109(a))**
**(Against Defendants Xerox, Allaire, Mulcahy, and Thoman)**

**160.** ~~166.~~ Plaintiffs incorporate the allegations contained in the previous paragraphs of

this Consolidated Amended Complaint as if fully set forth herein.

**161.** ~~167.~~ At all relevant times, Defendants were and acted as fiduciaries of their

respective Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**162.** ~~168.~~ ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a),

29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and ——
>
> (A)    for the exclusive purpose of
>
> (i)    providing benefits to participants and their
> beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the
> plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances
> then prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of like character and with like
> aims;
>
> (C)    by diversifying the investments of the plan so as to minimize the
> risk of large losses, unless under the circumstances it is clearly prudent not to do so;
> and

(D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

**163.**     169. Moreover, ERISA fiduciaries have a duty to speak truthfully, to not mislead participants and to disclose truthful information on their own initiative when participants need such information to exercise their rights under the plan.

**164.**     170. In a plan with various funds available for investment, this duty to inform and disclose also includes:  (1) the duty to provide to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to advise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty to refrain from material misrepresentations.

**165.**     171. ERISA also imposes strict co-fiduciary duties on plan fiduciaries.  ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

(a)     In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(**1**) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**166.**     172. Defendants breached their fiduciary and co-fiduciary duties by failing to provide participants and beneficiaries with complete and accurate information regarding Xerox

stock, and misleading participants and beneficiaries regarding the soundness of Xerox stock, and the prudence of investing their retirement benefits in Xerox stock.  29 U.S.C. §1109(a).

**167.** ~~173.~~ Defendants' breaches of fiduciary duties caused participants and beneficiaries of the Plan and UNITE Plan to continue to make and to maintain substantial investments in the Xerox Stock Fund in the Plan and UNITE Plan at a time when Defendants knew or should have known that the Fund was not a prudent investment option.

**168.** ~~174.~~ Each Defendant knowingly participated in these fiduciary breaches of its co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA § 404(a), 29 U.S.C. § 1104(a), and had knowledge of the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

**169.** ~~175.~~ In addition to its liability as a fiduciary, Defendant Xerox has liability, to the extent it acted with respect to the Plans in a non-fiduciary capacity, as a knowing participant in the fiduciary breaches of the other Defendants.  Xerox was and is a party in interest to the Plans within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), because it was and is (a) a fiduciary of the Plans; (b) a person providing services to the Plans; (c) an employer with some employees covered by the Plans; and/or (d) a corporation fifty percent or more of which is owned directly or indirectly by persons described in subparagraphs (a), (b) or (c).  As such, Xerox had a duty under ERISA to refrain from participating in any breaches of fiduciary duty with respect to the Plans when, as here, it had actual or constructive knowledge of such breaches.

**170.** ~~176.~~ Xerox knowingly participated in its own and the other Plan fiduciaries' breaches described above, with actual or constructive knowledge of those breaches, in violation of ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**171.** ~~177.~~ As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars.

~~**COUNT V**~~

~~**BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST**~~

~~178.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Consolidated Amended Complaint as if fully set forth herein.~~

~~179.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.~~

~~180.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow Company Stock as a Plan Investment during the Class Period, by continuing to participate in various Company compensation programs that created a substantial personal interest in certain Defendants to maintain a high public price for Xerox Stock, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plans' investments in Company Stock and the information provided to participants and beneficiaries concerning it, and generally by failing to take whatever steps were necessary to ensure that the Plans' fiduciaries did not suffer from a conflict of interest.~~

~~181.    If the Defendants had at all times discharged their fiduciary duties to avoid conflicts of interest, including by resigning if necessary, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars.~~

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     That the Court certify this action as a class action under Rule 23(b)(1), 23(b)(2) or 23(b)(3) with respect to the Plan Class and UNITE Class to the extent necessary to effect the purposes of this suit;

2.     That the Court enter Judgment providing the following relief to Plaintiffs, and the Plan Class and UNITE Class;

3.     Joint and several liability against Defendants, requiring them to make the Plans whole for the losses incurred as a result of their violations of ERISA, pursuant to ERISA § 502(a)(2), 29 U.S.C. §1109(a);

4.     Injunctive **and equitable** relief ~~enjoining Defendants from continuing to violate their fiduciary duties under ERISA and the plan documents~~**as appropriate to remedy the breaches alleged above**, pursuant to ERISA §§ 409(a) and 502(a)(2) & (3), 29 U.S.C. §§ 1109(a), and 1132(a)(2) & (3);

5.     ~~Other injunctive and equitable relief as appropriate to remedy the breaches alleged above, pursuant to ERISA §§ 409(a) and 502(a)(2) & (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) & (3);6.~~ Reasonable attorneys' fees and costs incurred by Plaintiffs and the Classes, pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

~~7.~~**6.**     Interest on all Judgment amounts as provided by law; and

~~8.~~**7.**     Such other legal or equitable relief as may be just and proper.

DATED this ~~15~~**17**th day of ~~November, 2002.~~**May, 2007.**

Respectfully Submitted By

/s/_____

**Lynn Lincoln Sarko**

- 67 -

**Elizabeth A. Leland**
**Gary A. Gotto**

**Keller Rohrback L.L.P.**
**1201 Third Avenue, Suite 3200**
**Seattle, WA 98101**
**(206) 623-1900 / Fax (206) 623-3384**
**Co-Lead Counsel**

Goodman, Rosenthal & McKenna, PC
John F. McKenna, Esq. - ct00104
~~68 South Main Street~~**977 Farmington Avenue,**
**Suite 200**
West Hartford, Connecticut ~~06106~~**06107**
860-231-2800
**Liaison Counsel**

~~Keller Rohrback LLP~~
~~Lynn Lincoln Sarko~~
~~Gary A. Gotto~~
~~Laurie B. Ashton~~
Erin M. Riley
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
206-623-1900 (Seattle)
602-248-0088 (Phoenix)
~~Co-Lead Counsel~~

~~Susman &~~**Futterman Howard** Watkins **Wylie**
**& Ashley, Chtd.**
Charles R. Watkins
John R. Wylie
~~Two First National Plaza~~**122 S. Michigan**
**Avenue**, Suite ~~600~~**1850**
Chicago, Illinois 60603
312-~~346-3466~~
~~Co-Lead Counsel~~**427-3600**

**Steering Committee Counsel**:

Law Offices of Daniel M. Harris
Daniel M. Harris
150 North Wacker Drive, Suite 3000
Chicago, Illinois 60606
312-960-1802
Counsel for Plaintiffs

Berger & Montague, P.C.
Todd Collins
**Sherrie R. Savett**
**Joy Clairmont**
1622 Locus Street
Philadelphia, PA 19103-6365
(215) - 875-3040

~~Schiffrin & Barroway~~
Marc A. Topaz
Joseph H. ~~Meltzer~~
~~Three Bala Plaza East~~
~~Suite 400~~
~~Bala Cynwyd, PA 19004~~
~~(610)~~  **Meltzer Schiffrin Barroway**
**Topaz & Kessler, LLP**
**280 King of Prussia Road**
**Radnor, PA 19087**
**610-**667-7706

~~UNITED STATES DISTRICT COURT~~
~~DISTRICT OF CONNECTICUT~~

|  |  |  |
|---|---|---|
| ~~In re XEROX CORPORATION ERISA~~ ~~LITIGATION,~~ | ) ) ) ) | ~~Master File No. 02-CV-1138 (AWT)~~ ~~CLASS ACTION~~ |
| ~~This Document Relates to:~~ | ) ) ) | ~~CONSOLIDATED AMENDED~~ ~~COMPLAINT~~ |
| ~~ALL ACTIONS~~ | ) ) ) | ~~NOVEMBER 15, 2002~~ |

~~**CERTIFICATION**~~

~~This is to certify that a copy of the foregoing, CONSOLIDATED AMENDED~~

~~COMPLAINT, was mailed this 15th day of November, 2002, via U.S. First Class mail, to the~~

~~following counsel of record:~~

~~Charles R. Watkins, Esq.~~                    ~~Benjamin H. Green~~
~~Susman & Watkins~~                             ~~Karlene J. Rogers~~
~~Two First National Plaza~~                     ~~Emmet, Marvin & Martin~~
~~Suite 600~~                                    ~~1351 Washington Boulevard~~

~~Chicago, IL 60603~~

~~Daniel M. Harris, Esq.~~
~~Law Offices of Daniel M. Harris~~
~~150 North Wacker Drive~~
~~Suite 3000~~
~~Chicago, IL 60606~~

~~Lynn Lincoln Sarko~~
~~Gary A. Gotto~~
~~Erin M. Riley~~
~~Laurie B. Ashton~~
~~Keller Rohrback, LLP~~
~~1201 Third Avenue, Sutie 3200~~
~~Seattle, Washington 98101-3052~~

~~Joseph H. Meltzer~~
~~Marc A. Topaz~~
~~Schiffrin & Barroway, LLP~~
~~Three Bala Plaza East, Suite 400~~
~~Bala Cynwyd, PA 19004~~

~~Sherrie R. Savett~~
~~Stuart Guber~~
~~Berger & Montague, P.C.~~
~~1622 Locust Street~~
~~Philadelphia, PA 19103~~

~~Stamford, CT 06905~~

~~Michael D. Ryan~~
~~Senior Counsel~~
~~Xerox Corporation~~
~~800 Long Ridge Road~~
~~Stamford, CT 06904~~

~~David Pickle~~
~~Steven J. Sacher~~
~~Kilpatrick Stockton LLP~~
~~607 14th Street, Suite 900~~
~~Washington, D.C. 20005~~

~~William H. Boice~~
~~Kilpatrick Stockton LLP~~
~~1100 Peachtree Street, Suite 2800~~
~~Atlanta, GA 30309~~

~~John M. McKenna, Esq.~~
~~Goodman, Rosenthal & McKenna, P.C.~~
~~Fed. Bar No. ct00l04~~
~~68 South Main Street~~
~~West Hartford, CT 06107-2445~~
~~(860) 231-2800~~
~~Fax: (860) 523-9235~~

**Ellen Doyle**
**Malakoff Doyle & Finberg, P.C.**
**The Frick Building**
**437 Grant Street, Suite 200**
**Pittsburgh, PA 15219-6003**
**412-281-8400**
**Brian McTigue**
**McTigue & Porter LLC**
**5301 Wisconsin Avenue, N.W. Ste. 350**

**Washington, DC 20015**
**202-364-6900**

Document comparison done by DeltaView on Monday, May 21, 2007 2:35:02 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://NYI/NYI/3991409/1 |
| Document 2 | interwovenSite://NYI/NYI/3991409/2 |
| Rendering set | JD Blackline |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 78 |
| Deletions | 292 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 370 |